Refugio FERNANDEZ; Maria Fernandez, individually and on behalf of others similarly situated; Maria Calderon, Plaintiffs–Appellants,

v.

William E. BROCK; Ford Barney Ford, Acting Secretary, in his capacity as Acting Secretary of Labor; Robert A.G. Monks, in his capacity as Administrator of the Office of Pensions and Welfare Benefit Programs; Donald Regan, in his capacity as Secretary of the Treasury; Roscoe L. Egger, Jr., in his capacity as Commissioner of the Internal Revenue Service; Teodoro Calderon, Defendants–Appellees.

No. 86–2033.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1987.

Prior Opinion Withdrawn Per Order Feb. 24, 1988.

New Opinion Decided Feb. 24, 1988.

As Amended on Denial of Rehearing and Rehearing En Banc May 23, 1988.

---

Neal S. Dudovitz, Nat. Sr. Citizens Law Center, Los Angeles, Cal., for plaintiffs-appellants.

John P. Giraudo, Office of Legal Counsel, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before WALLACE and POOLE, Circuit Judges, and REA,[*] District Judge.

### ORDER

The prior opinion in this case, filed July 20, 1987, 822 F.2d 865, is hereby withdrawn. The attached opinion is ordered filed in its place.

### OPINION

WALLACE, Circuit Judge:

Four migrant farmworkers (farmworkers) appeal the district court's order granting summary judgment to the Secretary of the Treasury and other federal officials and agencies (collectively "Secretary"). The farmworkers sought an order compelling the Secretary to promulgate regulations under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, that would govern pension plans for seasonal workers. We have jurisdiction pursuant to 28 U.S.C.

---

[*] Honorable William J. Rea, United States District Judge, Central District of California, sitting by designation.

§ 1291. We affirm in part and reverse and remand to dismiss in part.

## I

The farmworkers have been employed for several summers as seasonal farmworkers by Kawahara, a strawberry grower. Kawahara maintains a pension plan for his employees. The farmworkers, however, have seldom been eligible to participate in the plan because they customarily were not employed at least 1,000 hours per year, the threshold set by Kawahara for participation. Moreover, the farmworkers accrued and vested few benefits because they rarely met the plan's thresholds for accrual and vesting.

ERISA does not require employers to provide employees with pension plans, but it does require employers with plans to meet ERISA's minimum standards for participating in the plan, accrual of benefits, and vesting of benefits. ERISA requires that an employee must be eligible to participate in a plan after "he completes 1 year of service," which, for ordinary workers, is defined as 1,000 hours of employment in a 12–month period. 29 U.S.C. § 1052(a)(3)(A). Similarly, ERISA requires that an employee accrue benefits after a "year of participation," defined as 1,000 hours of employment in a 12–month period. 29 U.S.C. § 1054(b)(3)(C). ERISA requires that benefits vest after a number of years of participation, according to varying formulas. 29 U.S.C. § 1053.

The statute declares, however, that "[i]n case of any seasonal industry where the customary period of employment is less than 1,000 hours during a calendar year, the term 'year of service' shall be such period as may be determined under regulations prescribed by the [Secretary]." 29 U.S.C. § 1052(a)(3)(B). The statute similarly provides for the promulgation of regulations governing the accrual and vesting periods for seasonal workers' benefits. *See* 29 U.S.C. §§ 1053(b)(2)(C), 1054(b)(3)(D).

The farmworkers filed suit in district court seeking mandamus, declaratory, and injunctive relief. They contended that the Secretary has a duty to promulgate regulations under ERISA governing the participation, accrual, and vesting thresholds for seasonal workers. The Secretary moved for summary judgment on the grounds that the farmworkers lacked standing and that the statute did not obligate the Secretary to issue seasonal worker rules. The district court held that the farmworkers had standing but granted summary judgment after concluding that the Secretary's authority to issue the regulations was discretionary.

## II

A federal court's "judicial Power" extends to "Cases ... arising under ... the Laws of the United States." U.S. Constitution, art. III, sec. 2. It is not enough that a litigant claims that a violation of federal law has occurred; the litigant must have "standing" to invoke the power of a federal court. "Otherwise, the power 'is not judicial ... in the sense in which judicial power is granted by the Constitution to the courts of the United States.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (*Valley Forge*), quoting *United States v. Ferreira*, 54 U.S. (13 How.) 40, 48, 14 L.Ed. 42 (1852). In this case, we need only be concerned with those aspects of standing derived directly from the Constitution, although the doctrine of standing also encompasses several judicially imposed "prudential" requirements. *See id.* 454 U.S. at 471–72, 102 S.Ct. at 758. Standing for purposes of the Constitution is present when a plaintiff suffers actual or threatened "[1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (*Allen*).

The question of standing in this case was raised as part of the Secretary's motion for summary judgment. Ordinarily, a plaintiff opposing a motion for summary judgment on this issue would have to support, with

affidavits or other evidence, the factual allegations underlying the assertion of standing because such allegations must ultimately be proven for a plaintiff to prevail. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 & n. 31, 99 S.Ct. 1601, 1615–16 & n. 31, 60 L.Ed.2d 66 (1979) (*Gladstone*). For purposes of the present appeal, however, we will " 'accept as true all material allegations of the complaint ...' as standing was challenged largely on the basis of the pleadings." *Id.* at 109, 99 S.Ct. at 1613, *quoting Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed. 2d 343 (1975). In reviewing a summary judgment, whether standing exists is a question of law we review de novo. *Bruce v. United States*, 759 F.2d 755, 758 (9th Cir.1985). The farmworkers argue that they have suffered two injuries traceable to the Secretary that will be redressed by ordering the Secretary to promulgate regulations. We consider each of these alleged injuries in turn.

### A.

■ The first injury claimed by the farmworkers is the loss of pension benefits. This loss constitutes a personal economic injury sufficient to satisfy the first prong of the article III standing requirement. But this alone does not provide standing. Article III power to decide this case exists only if the second and third prongs of the test for standing are also satisfied: the injury must be fairly traceable to or caused by the Secretary's failure to promulgate regulations and must be likely to be redressed by compelling the promulgation of regulations. *Allen*, 468 U.S. at 751, 104 S.Ct. at 3324. For purposes of our disposition of this case, we will focus on the issue of redressability. *See Allen*, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19.

The farmworkers' line of reasoning demonstrates the difficulty of meeting the redressability prong for article III standing. Reduced to its simplest form, they contend that their injury will be redressed by the relief they seek because, if they prevail, the Secretary must issue some regulations.

These regulations may require minimum eligibility thresholds for farmworkers that are lower than Kawahara's present 1,000–hour-per-year standard. If so, Kawahara would be required to comply with the regulations' more liberal standard if he chooses to maintain an employee benefit plan. If Kawahara does so choose and does implement a plan with a lower standard, the farmworkers may be able to qualify as participants in the plan. If the farmworkers qualify, they ultimately may accrue and vest retirement benefits.

We are guided in our evaluation of the farmworkers' argument by two Supreme Court cases. In the first, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (*Simon*), a group of indigents challenged the government's granting a tax exemption to certain hospitals. The indigents asserted that the government was required to demand that the hospitals provide greater services to indigents before the hospitals could become eligible for the tax exemption. The Court held that the plaintiffs did not have standing because it was "speculative" whether the remedy sought in the lawsuit would result in the greater availability of hospital services to indigents. *Id.* at 43, 96 S.Ct. at 1926. The hospitals might "elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services." *Id.* Furthermore, although the complaint alleged that the hospitals received "substantial donations deductible by the donors," it was "speculative at best" to infer that the hospitals were so financially dependent on the favorable tax exempt treatment that they would admit the indigents if required to do so as a condition of receiving the tax benefit. *Id.*

In a second case, *Allen*, the parents of black children brought suit alleging that the government failed to deny tax-exempt status to racially discriminatory private schools and thereby interfered with their children's opportunity to be educated in desegregated public schools. The Court concluded that standing did not exist after observing that it was "entirely speculative

... whether withdrawal of a tax exemption from any particular school would lead the school to change its policies." 468 U.S. at 758, 104 S.Ct. at 3328. Further, it was "just as speculative whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes ... made by the private school once it was threatened with loss of tax-exempt status." *Id.* Finally, it was also "pure speculation" whether enough schools and parents would reach decisions having "a significant impact on the racial composition of the public schools." *Id.*

In the case before us, we similarly conclude that it is speculative at best whether a court order compelling the Secretary to promulgate regulations will enlarge the farmworkers' pension benefits. First, ordering the Secretary to prescribe regulations for seasonal workers does not guarantee that the regulations will have thresholds meaningfully lower than Kawahara's present 1,000 hour standard. The Secretary might prescribe 900 hours, 999 hours or even 1,000 hours per year as the appropriate level for strawberry field workers. The farmworkers do not allege that the Secretary would conclude that any particular number of hours was appropriate. Second, if the Secretary does prescribe lower minimum standards for participation, accrual, and vesting, it is entirely speculative whether Kawahara will continue to maintain a pension plan when faced with the new conditions. He is not required to do so. Kawahara might elect to stop funding a pension plan altogether. Or he might offset any change in participation and accrual thresholds by raising the standards for vesting. The farmworkers do not even allege that Kawahara is likely to continue funding a pension plan when faced with the new regulations. Indeed, the farmworkers could not conceivably predict how Kawahara would react because no one can predict what the regulations might require. Third, even if Kawahara elects to maintain a pension plan with a lower eligibility standard, it is entirely speculative whether the farmworkers will meet that standard.

The farmworkers contend, however, that they have standing if the allegations in their complaint establish that the Secretary's inaction deprived them of an "opportunity" to receive benefits. They call our attention to *Preston v. Heckler,* 734 F.2d 1359 (9th Cir.1984) (*Preston*), where we concluded that an American Indian had standing to sue the Secretary of Health and Human Services when she allegedly failed to adopt separate standards for evaluating the employment qualifications of Indians and consequently deprived the plaintiff of a "fair opportunity" to be evaluated for employment. *Id.* at 1366. The farmworkers contend that because the relief they request would similarly increase their "opportunity" to receive pension benefits, they have standing.

Our analysis in *Preston* focused on the first prong of the test for article III standing, personal injury, under the Administrative Procedures Act. We found that the plaintiff there had shown sufficient injury in fact because she had been "deprived of a fair opportunity to be evaluated for employment in the manner provided by law." *Id.* In the circumstances then before us, however, it was not necessary to give the issue of redressability more than cursory treatment. The plaintiff had sued the party causing her immediate injury. This party, by issuing the regulations whose absence was the sole cause of Preston's injury, could ensure that Preston received the ultimate benefit she sought: "a fair opportunity to be evaluated for employment in the manner provided by law." *Id.* More importantly, relief for the plaintiff in *Preston* was not conditioned on the discretionary behavior of any third party.

Both *Allen* and *Simon,* in contrast, involved an extra link in the chain of redressability not present in *Preston.* The plaintiffs in both *Allen* and *Simon* sued the IRS, a party which was not the immediate source of their injuries. By prevailing, the plaintiffs in those two cases would have been certain that the IRS would modify its regulations. But this modification would not ensure that the third parties involved— private schools in one case and hospitals in the other—would modify their behavior.

That is, the plaintiffs in *Allen* and *Simon* could not predict with any degree of accuracy whether prevailing would increase their opportunity to get what they sought —desegregated schools and hospital services for the indigent respectively.

The case before us presents a situation parallel to *Allen* and *Simon.* If the farmworkers prevail, the Secretary will issue regulations governing ERISA plans for seasonal workers. But the farmworkers do not know what the regulations will say and cannot predict whether their employer will continue to offer a pension plan at all. Therefore, it is speculative whether the relief they seek will increase their opportunity to receive pension benefits. Indeed, in the present case, the chain of causation is even more attenuated because the farmworkers cannot with any degree of probability assert that the Secretary will promulgate regulations for farmworkers that differ meaningfully from the existing 1,000 hour standard.

We conclude, therefore, that the farmworkers' allegations do not establish that requiring the Secretary to promulgate regulations will increase their access to pension benefits.

## B.

The second injury claimed by the farmworkers is the violation of their statutory rights under ERISA. This argument became clear after we requested re-briefing on the issue and called to their attention *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir.1975) (*City of Davis*), a case not cited earlier by either party. To support their contention that this violation amounts to a cognizable "personal injury" for article III purposes, they now rely on *City of*

*Davis, Alvarez v. Longboy,* 697 F.2d 1333 (9th Cir.1983) (*Alvarez*), *Dellums v. Smith,* 797 F.2d 817 (9th Cir.1986) (*Dellums*), and *Greater Los Angeles Council on Deafness, Inc. v. Baldrige,* 827 F.2d 1353 (9th Cir.1987) (*Council on Deafness*). They contend that these cases stand for the broad proposition that when Congress enacts a statute imposing a statutory duty, the violation of this duty is sufficient to satisfy the injury-in-fact prong of standing, even though no injury would exist without the statute. They then contend that 29 U.S.C. §§ 1052(a)(3)(B),[1] 1053(b)(2)(C),[2] and 1054(b)(3)(D) [3] impose statutory duties on the Secretary to promulgate regulations and that these sections create procedural rights, the violation of which satisfies the injury-in-fact requirement of article III.

We agree that these four cases provide guidance in determining whether the farmworkers have alleged an injury-in-fact sufficient for article III purposes. We do not, however, agree with the proposition that the mere violation of a statutory duty satisfies the injury-in-fact requirement of article III.

In *City of Davis,* we determined that the City of Davis had standing to sue the Secretary of Transportation to compel the Secretary to prepare and file an environmental impact statement (EIS). *City of Davis,* 521 F.2d at 670–71. Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), requires federal agencies contemplating major action to prepare and consider an EIS whenever the proposed action may significantly affect the quality of the human environment. In reaching our conclusion that the City of Davis satisfied the injury-in-fact requirement, we examined NEPA's statutory language. We pointed out that NEPA

1. 29 U.S.C. § 1052(a)(3)(B) states:
   In the case of any seasonal industry where the customary period of employment is less than 1,000 hours during a calendar year, the term "year of service" shall be such period as may be determined under regulations prescribed by the Secretary.

2. 29 U.S.C. § 1053(b)(2)(C) states:
   In the case of any seasonal industry where the customary period of employment is less than 1,000 hours during a calendar year, the term

"year of service" shall be such period as determined under regulations of the Secretary.

3. 29 U.S.C. § 1054(b)(3)(D) states:
   In the case of any seasonal industry where the customary period of employment is less than 1,000 hours during a calendar year, the term "year of participation" shall be such period as determined under regulations prescribed by the Secretary.

is "essentially a procedural statute" which requires federal agencies to follow an established procedure for evaluating the environmental effects of their contemplated action. *City of Davis*, 521 F.2d at 670. We observed that one of NEPA's broad objectives was to bring environmental consequences to the attention of decisionmakers. *Id.* We concluded that Congress, in imposing the statutory duty of preparing an EIS, intended to create procedural rights in people who have a sufficient geographical nexus to the site of the challenged project that they could be expected to suffer whatever environmental consequences the project may have. Thus, we stated that "[t]he procedural injury implicit in agency failure to prepare an EIS ... is itself a sufficient 'injury in fact' to support standing." *Id.* at 671.

In *Alvarez*, we determined that striking migrant farmworkers had satisfied the injury-in-fact requirement of article III. We analyzed the statutory language and the legislative history of the Farm Labor Contractor Registration Act of 1963, 7 U.S.C. §§ 2041–2055, and determined that section 2045(b)(7), which requires every farm labor contractor to notify each worker at the time he is recruited the existence of a strike, was intended to benefit striking workers as well as the recruited workers. We concluded that the Act created a procedural right on the part of striking workers to compliance with the notice provision of section 2045(b). The invasion of this procedural right was sufficient to satisfy the injury-in-fact requirement. *Alvarez*, 697 F.2d at 1337–38.

In *Dellums*, we summarized the teachings of *Alvarez* and *City of Davis*. We recognized that Congress could "create procedural rights, the invasion of which constitutes injury-in-fact and suffices to support standing." *Dellums*, 797 F.2d at 821. We then stated, however, that merely because Congress imposed a statutory duty on a member of the executive branch, Congress did not necessarily create procedural rights in a given plaintiff. *Id.* Such an analysis "bypassed entirely the injury-in-fact inquiry." *Id.* Instead, we stated that in order to determine whether Congress

intended to create procedural rights from the imposition of statutory duties, we should look for evidence in the statutory language, the statutory purpose, and the legislative history. *Id.*

We then engaged in an inquiry consistent with *City of Davis* and *Alvarez*. We concluded that Congress, in enacting the Ethics in Government Act, 28 U.S.C. §§ 591–598, imposed a mandatory duty on the Attorney General, pursuant to section 592, to undertake a preliminary investigation under the Act to determine whether to apply for the appointment of independent counsel whenever the Attorney General receives specific information from a credible source indicating that a high level federal official may have committed a crime. *Id.* at 819. Notwithstanding this statutory duty, however, we concluded that Congress did not create procedural rights in persons who supply the information or in the general public to have their allegations investigated. *Id.* at 821–23. We reached this conclusion after examining the statutory language, the statutory purpose, and the legislative history of the Act. *Id.*

In *Council on Deafness*, two deaf individuals on behalf of themselves and a class, a non-handicapped individual representing deaf individuals, and an organization representing deaf and hearing-impaired individuals brought suit against the Secretary of Commerce. The complaint alleged that the Secretary's failure to act on their administrative complaint, which they filed pursuant to regulations promulgated under 29 U.S.C. § 794, violated section 794 of the Rehabilitation Act and the Department of Commerce's own regulations requiring it to act on complaints of handicap discrimination. 827 F.2d at 1356. Section 794 prohibits a handicapped individual from being denied "the benefits of ... any program or activity receiving Federal financial assistance." The plaintiffs sought to compel the Secretary to investigate plaintiffs' complaint concerning a television station that received federal funds, but that refused to provide programming for the hearing impaired.

Without citing *City of Davis, Alvarez,* or *Dellums,* and without analyzing the statute, its purpose, or its legislative history, we concluded that all of the plaintiffs had satisfied the injury-in-fact requirement of article III. We apparently concluded that Congress, in enacting section 794 and imposing the accompanying duties, intended to create procedural rights in certain handicapped individuals. *Id.* at 1358. The invasion of this procedural right satisfied the injury-in-fact requirement of article III. But we do not read *Council on Deafness* as jettisoning the accepted analysis for determining standing developed in *City of Davis, Alvarez,* and *Dellums.*

■ The foregoing demonstrates that a plaintiff who merely claims that a defendant violated a statutory duty does not necessarily satisfy the requirement of injury in fact in article III. Instead, we hold that the crucial inquiry in such a situation is whether a statute that imposes statutory duties creates correlative procedural rights in a given plaintiff, the invasion of which is sufficient to satisfy the requirement of injury in fact in article III. In determining whether a given statutory duty creates a correlative procedural right, we look to the statutory language, the statutory purpose, and the legislative history. *Dellums,* 797 F.2d at 821.

■ We read the farmworkers' complaint to allege that in enacting 29 U.S.C. §§ 1052(a)(3)(B), 1053(b)(2)(C), and 1054(b)(3)(D), Congress intended to impose statutory duties on the Secretary and thereby create correlative procedural rights in the farmworkers. In analyzing the threshold standing issue, we assume that the Secretary has a statutory duty to issue the regulations discussed in sections 1052(a)(3)(B), 1053(b)(2)(C), and 1054(b)(3)(D). Whether he does have such a duty is not determined until after we have determined whether the farmworkers have standing. As required by *Dellums,* we examine the statutory language, the statutory purpose, and the legislative history of the provisions to determine whether Congress intended to create correlative procedural rights in the farmworkers.

First, an examination of the statutory language indicates that Congress recognized the needs of seasonal workers. Section 1052(a)(3)(B) states that the Secretary may define "year of service" for the purpose of determining the minimum participation standards for pension plans in seasonal industries. Section 1053(b)(2)(C) states that the Secretary may define "year of service" for the purpose of determining the minimum vesting standards for pension plans in seasonal industries. Section 1054(b)(3)(D) states that the Secretary may define "year of service" for the purpose of determining the benefit accrual requirements for pension plans in seasonal industries. Although these provisions are not as clear as those at issue in *Alvarez,* which specifically mentioned the workers, 697 F.2d at 1335 n. 1, we believe that these provisions indicate that Congress recognized the needs of those who worked in seasonal industries, such as seasonal farmworkers.

Second, an examination of ERISA's purpose and statutory scheme indicates that Congress intended to create correlative procedural rights in those who benefit from pension plans. Congress's primary purpose in enacting ERISA was to protect "individual pension rights." S.Rep. No. 127, 93d Cong., 1st Sess. 35 (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639. Congress specifically wanted to provide minimum standards for pension plans in order to ensure their "equitable character." 29 U.S.C. § 1001(a). Section 1001 also reveals Congress's concern for "employees with long years of service" who fail to gain retirement benefits due "to the lack of vesting provisions in such plans." 29 U.S.C. § 1001(a); *see also* § 1001(c). Congress intended the enforcement provisions of section 1132 to provide broad remedies for redressing or preventing statutory violations and to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective enforcement of pension laws. S.Rep. No. 127, 93d Cong., 1st Sess. 35 (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4871. *Cf. Alvarez,* 697 F.2d at 1336 (not-

ing remedial nature of statutory scheme of the Farm Labor Contractor Registration Act). Thus, ERISA's remedial purpose supports the conclusion that Congress intended to create correlative procedural rights in individuals intended to benefit from pension plan regulation.

Third, the legislative history, although sparse and somewhat ambiguous, also supports this conclusion. The Senate initially attempted to address the problems of seasonal industry pension plans by drafting legislation that defined year of service for those in seasonal industries. *See* S.Rep. No. 383, 93d Cong., 1st Sess. 39–44 (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News 4890, 4924–29. The Senate wanted "to facilitate the coverage of seasonal employees" under pension plans. *Id.* at 40, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4890, 4925.

The House, however, disagreed with the Senate. The House concluded that instead of specifically defining "year of service" for seasonal industries, the law should leave the determination to the relevant agency responsible for enforcement. H.R. Rep. No. 779, 93d Cong., 2d Sess. 15–16 (1974).

The House–Senate Conference Committee resolved the conflict between the two approaches. The Committee decided to allow the Secretary of Labor to determine what, if any, special rules would govern pension plans for seasonal workers. *See* H.R.Rep. No. 1280, 93d Cong., 2d Sess. 263 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 5038, 5045–46. Senator Javits, one of the Senate's floor managers on the bill, indicated that Congress intended the provisions at issue to aid seasonal employees. *See* 120 Cong.Rec. 29936 (1974).

Although the issue is close, we conclude that the invasion of the procedural rights allegedly created by these provisions is sufficient to establish the requisite injury in fact. *See Dellums,* 797 F.2d at 821–22; *Alvarez,* 697 F.2d at 1338; *City of Davis,* 521 F.2d at 670–71; *see also Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973) (dic-

ta). The causation and redressability requirements are satisfied because an order requiring the Secretary to promulgate some regulations would redress the farmworkers' procedural injury. Thus, the farmworkers have standing to contest the Secretary's refusal to promulgate any regulations pursuant to sections 1052(a)(3)(B), 1053(b)(2)(C), and 1054(b)(3)(D).

### III

■ Because the farmworkers have standing, we next consider their contention that 29 U.S.C. §§ 1052(a)(3)(B), 1053(b)(2)(C), and 1054(b)(3)(D) require the Secretary to promulgate special regulations for participation, vesting, and accrual to cover workers in seasonal industries. The Secretary who administers the statutes has concluded that his duty to promulgate regulations covering seasonal workers is merely discretionary. In *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed. 2d 694 (1984) (*Chevron*), the Supreme Court outlined the test for reviewing an agency's construction of a statute which it administers. First, we must inquire whether Congress has directly spoken to the precise question at issue. If so, our inquiry is complete, and we will direct the agency to comply with the intent of Congress. If we determine that Congress's intent is unclear, however, we will defer to the agency's interpretation of the statute if it "is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. We may not substitute our own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. *Id.* at 844, 104 S.Ct. at 2782; *see also Chemical Manufacturers Association v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125–26, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985) (agency's construction of its statute cannot be impeached absent contrary clear, unambiguous intent); *NLRB v. United Food and Commercial Workers Union, Local 23,* —— U.S. ——, ——, 108 S.Ct. 413, 426, 98 L.Ed.2d 429 (1987) (Scalia, J., concurring) (emphasizing "the continuing and unchanged vitality of

the test for judicial review of agency determination of law set forth in *Chevron, ...*" notwithstanding dicta in *INS v. Cardoza-Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987).).

As in all cases of statutory interpretation, our starting point in determining Congress's intent must be the language of the statute itself. *See, e.g., Lewis v. United States,* 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). Unless exceptional circumstances dictate otherwise, if we find the statutory language unambiguous, then we will not resort to the legislative history. *Burlington Northern Railroad Co. v. Oklahoma Tax Commission,* —— U.S. ——, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) (*Burlington Northern*).

The language of the statute does not reveal an intent to create a mandatory duty to promulgate regulations governing workers in seasonal industries. When discussing the minimum rules for plan participation for seasonal workers, section 1052(a)(3)(B) states that "the term 'year of service' shall be such period *as may be determined* under regulations prescribed by the Secretary." 29 U.S.C. § 1052(a)(3)(B) (emphasis added). When discussing minimum rules for vesting, section 1053(b)(2)(C) states that "the term 'year of service' shall be such period *as determined* under regulations of the Secretary." 29 U.S.C. § 1053(b)(2)(C) (emphasis added). Finally, section 1054(b)(3)(D), which discusses benefit accrual requirements, states that "the term 'year of participation' shall be such period *as determined* under regulations prescribed by the Secretary." 29 U.S.C. § 1054(b)(3)(D) (emphasis added).

The farmworkers contend that the presence of the language "as may be determined" in section 1052(a)(3)(B) and the absence of such language in sections 1053(b)(2)(C) and 1054(b)(3)(D) demonstrate an ambiguity on the question of whether the Secretary's duties are mandatory or discretionary. A close reading of the statutory language leads us to conclude otherwise.

Section 1052(a)(3)(B) is clearly discretionary. The section expressly states "as may be determined." "May" is a permissive word, and we will construe it to vest discretionary power absent a clear indication from the context that Congress used the word in a mandatory sense. *See Burglin v. Morton,* 527 F.2d 486, 488 (9th Cir.1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976); *United States v. Bowden,* 182 F.2d 251, 252 (10th Cir.1950). We find no such indication in section 1052(a)(3)(B).

Sections 1053(b)(2)(C) and 1054(b)(3)(D) do not use the phrase "as may be determined"; therefore, the farmworkers claim that these provisions are mandatory. In making this argument, the farmworkers place great reliance on the phrase "the term ... *shall* be such period as determined under regulations," which is present in both section 1053(b)(2)(C) and 1054(b)(3)(D).

We cannot accept the farmworkers' proposed construction of the word "shall" for two reasons. First, the proposed construction makes little grammatical sense. The word "shall" appears in each of the three sections, including the clearly discretionary section 1052(a)(3)(B). The predicate nominative of the word "shall" in sections 1053(b)(2)(C) and 1054(b)(3)(D) is "period" not "regulations." The word "regulations" is merely a component of the clause that modifies the word "period." Thus, this term simply connects the word "term" with the phrase "such period" in each section; it does not limit or otherwise describe the Secretary's authority to issue regulations. Second, other sections of ERISA indicate that Congress knew how to use the word "shall" to mandate that the Secretary issue regulations when it chose to do so. For example, in section 1002(31), Congress stated that "[t]he Secretary of the Treasury shall issue regulations to further define acceptable actuarial cost methods." 29 U.S.C. § 1002(31). In section 1242(a), Congress stated "[t]he Joint Board shall, by regulations, establish reasonable standards and qualifications for persons performing actuarial services." 29 U.S.C. § 1242(a). Thus, at best, the farmworkers' argument

can be accepted only to show some ambiguity in sections 1053(b)(2)(C) and 1054(b)(3)(D). That would require us to look next at the legislative history.

The farmworkers contend that the legislative history indicates that Congress intended to impose a mandatory duty on the Secretary. The legislative history, however, does not provide clear support for the farmworkers' interpretation. The farmworkers place particular reliance on the Report of the Joint Conference Committee which states that:

> [I]n the case of seasonal industries where the customary period of employment is less than 1,000 hours, the term, "year of service" *is to be determined in accordance with the Labor Department regulations.*

H.R.Rep. No. 1280, 93d Cong., 2d Sess. 263 (1974) (emphasis added), *reprinted in* 1974 U.S.Code Cong. & Admin.News 5038, 5046. Another portion of the Committee's Report states that:

> Generally, a plan would not be required to accrue any benefit for years in which the participant had less than 1,000 hours of service. In the case of industries or occupations where the customary year is less than 1,000 hours (for example, the tuna fishing industry, or the winter season employees of a ski lodge), *the rules with respect to benefit accrual would be determined under Department of Labor regulations.*

*Id.* at 269 (emphasis added), *reprinted in* 1974 U.S.Code Cong. & Admin.News 5038, 5051. The farmworkers also point to Senator Javits's statement in which he said:

> Under the conference report, a year of service generally will constitute 1,000 hours (an exception being made for maritime industries where a year of service will constitute 125 days). In addition, a Senate amendment resulted in a *special rule for seasonal employees who customarily work less than 1,000 hours during a year; in this case the Secretary of Labor will write special regulations defining year of service.*

120 Cong.Rec. 29936 (1974) (emphasis added).

Though these statements provide some support for the farmworkers' argument that Congress intended the Secretary's duty to promulgate regulations to be a mandatory one, other statements in the legislative history undermine this argument. For example, the House–Senate Conference Committee apparently intended the Secretary to have discretion to issue the regulations:

> Under the conference substitute, the general rule is that no plan would be allowed to require as a condition of eligibility an age greater than 25, or a period of service longer than 1 year.... In general, 1,000 hours of work during a 12–month period will constitute a "year of service" although shorter periods *may be provided* by regulations for certain seasonal industries.

120 Cong.Rec. 29,929 (1974) (remarks of Senator Williams) (emphasis added).

Thus, the legislative history does not provide clear support for the farmworkers' interpretation. The legislative history is inconclusive at best.

Therefore, under *Chevron*, we next inquire whether the agency's resolution of this issue is based upon a permissible construction of the statute. In addressing this issue, the Court's reasoning in *Young v. Community Nutrition Institute*, 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986) (*Young*), provides important guidance. In *Young*, the Court was asked to determine whether under 21 U.S.C. § 346 the Food and Drug Administration (FDA) had a mandatory or discretionary duty to promulgate regulations concerning the tolerance levels for harmful, but unavoidable, substances contained in food. The FDA argued that section 346 was ambiguous and that its interpretation that the statute merely imposed a discretionary duty was reasonable. A consumer and two public interest groups argued that Congress intended to require the FDA to promulgate some regulations. The Court concluded that the statute and the legislative history were ambiguous. *Id.* 106 S.Ct. at 2364. The Court then restated the *Chevron* test and concluded that "the FDA's interpretation of § 346 [is]

sufficiently rational to preclude a court from substituting its judgment for that of the FDA." *Id.* at 2365.

In the present case, the Secretary has concluded that the statute confers discretionary authority to promulgate regulations regarding seasonal employment and has chosen not to do so. Here, as in *Young,* the Secretary's construction of sections 1052(a)(3)(b), 1053(b)(2)(C), and 1054(b)(3)(D) is "sufficiently rational to preclude [this] court from substituting its judgment for that of the [Secretary]." *Id.* Thus, even if sections 1053(b)(2)(C) and 1054(b)(3)(D) are ambiguous, we conclude that the Secretary retains discretion to promulgate regulations pursuant to the statutes.

### IV

The farmworkers do not have standing to assert their claim concerning the loss of pension benefits. They do, however, have standing to contest the Secretary's failure to promulgate regulations. Nonetheless, we conclude that the Secretary retains discretion in deciding whether to promulgate regulations governing seasonal workers. We therefore reverse the district court's judgment with respect to the farmworkers' first claim and remand with instructions to dismiss the claim for lack of jurisdiction. We affirm the district court's judgment with respect to the farmworkers' second claim. Each party will bear its costs on this appeal.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART WITH INSTRUCTIONS TO DISMISS THE FIRST CLAIM.