911 F.2d 117
 32 ERC 1213, 15 Fla. L. Week. D2127,
20 Envtl. L. Rep. 21,442
 DEFENDERS OF WILDLIFE, FRIENDS OF ANIMALS AND THEIR
ENVIRONMENT; and The Humane Society of the United
States, Appellees,
v.
Manuel LUJAN, as Secretary of the Interior, Appellant.
 Nos. 89-5192, 89-5386.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 17, 1990.
Decided Aug. 10, 1990.
 
 David C. Shilton, Washington, D.C., for appellant.
 Brian B. O'Neill, Minneapolis, Minn., for appellees.
 Before JOHN R. GIBSON and FAGG, Circuit Judges, and BRIGHT, Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The court again considers a challenge to a regulation promulgated by the Secretary of the Interior, Manuel Lujan, Jr., under the Endangered Species Act, 16 U.S.C. Secs. 1531-1544 (1988), which provides that federal agencies funding projects in foreign countries have no duty to consult with the Secretary about their projects' impact on endangered species. We earlier reversed the dismissal of this action brought by Defenders of Wildlife, Friends of Animals and Their Environment, and the Humane Society (collectively Defenders), and upon remand, the district court[1] held that Defenders had standing to bring this action and granted summary judgment on the merits in their favor. On appeal, the Secretary argues that the court erred in holding both that Defenders had standing and that Congress intended for the Endangered Species Act to apply to projects in foreign countries. We affirm the order of the district court.
 
 
 2
 Congress declared in the Endangered Species Act that "the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction." 16 U.S.C. Sec. 1531(a)(4). Toward this purpose, the Act requires each federal agency to consult with the Secretary to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." Id. Sec. 1536(a)(2). After consultation, the Secretary must issue a written opinion to the agency describing how the proposed agency action would affect the endangered species or critical habitat. The Secretary must also suggest reasonable alternatives if the agency action would jeopardize the existence of the species or habitat. Id. Sec. 1536(b)(3)(A).
 
 
 3
 Defenders brought this action to challenge a new regulation promulgated by the Secretary which limits the consultation obligation to agency action "in the United States or upon the high seas." 50 C.F.R. Sec. 402.01 (1986). The new regulation defines "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." Id. Sec. 402.02. This new regulation replaced a regulation which required agencies to consult with the Secretary concerning actions in foreign countries. See 50 C.F.R. Sec. 402.04 (1978).
 
 
 4
 The Secretary moved to dismiss for lack of subject-matter jurisdiction on the basis that Defenders lacked standing to bring the action. The district court granted the motion. 658 F.Supp. 43 (D.Minn.1987). On appeal, this court reversed and remanded because we held that Defenders had standing to challenge the regulation. 851 F.2d 1035 (8th Cir.1988). Upon remand, after further discovery on standing, including filing additional affidavits and deposing the affiants, the district court granted Defenders' motion for summary judgment on the issue of whether the Act requires agencies to consult with the Secretary on projects in foreign countries. 707 F.Supp. 1082 (D.Minn.1989). The court found that both the Act's plain language and its legislative history supported the court's conclusion that the consultation duty extended to foreign projects. Id. at 1084-86. The court ordered the Secretary to revoke and rescind the portion of the regulation limiting the consultation duty to agency actions in the United States or upon the high seas, and to publish proposed regulations clearly recognizing that the consultation duty applies to agency actions affecting endangered species wherever found. Id. at 1086. This appeal followed.
 
 I.
 
 5
 The Secretary first argues that our earlier decision, which held that Defenders' allegations concerning standing were sufficient to withstand a motion to dismiss, did not relieve Defenders of the burden of proving standing at the summary judgment phase of the litigation. They argue that Defenders lacked standing because it could not show that the organization or its members were in fact injured by the new regulation. According to the Secretary, no member of Defenders actually used the area around any foreign projects being funded by the United States.
 
 
 6
 Our examination of the standing issue is guided by the following fundamental principle:
 
 
 7
 [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).
 
 
 8
 Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The standing requirement "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." Id.
 
 
 9
 We address only the first requirement, injury in fact, because the Secretary does not contend that the traceability and redressability requirements are not met. In the earlier appeal to this court, we extensively discussed the standing issue and concluded that Defenders had sufficiently alleged injury in fact on two grounds. First, Defenders had alleged a substantive injury because the rate of extinction of endangered species was increasing in foreign countries which its members had visited to observe wildlife and which were the site of specific agency projects. 851 F.2d at 1040. Second, Defenders had alleged a procedural injury resulting from the Secretary's refusal to carry out statutorily-mandated procedures. Id. at 1040-41. Other courts of appeals have also recognized that failure to comply with required procedures may constitute injury in fact. See, e.g., National Wildlife Fed'n v. Hodel, 839 F.2d 694, 712 (D.C.Cir.1988); Munoz-Mendoza v. Pierce, 711 F.2d 421, 428 (1st Cir.1983); South East Lake View Neighbors v. Department of Housing & Urban Dev., 685 F.2d 1027, 1038-39 (7th Cir.1982); City of Davis v. Coleman, 521 F.2d 661, 670-72 (9th Cir.1975).
 
 
 10
 Upon remand to the district court, the Secretary again raised the standing issue, this time in its motion for summary judgment. The Secretary argued that Defenders bore a greater burden in proving standing at the summary judgment stage than it did when responding to the motion to dismiss, and insisted that Defenders had failed to carry this burden. The district court dealt with this argument as follows: "Although the court appreciates the distinction urged by the Secretary, it feels that the Eighth Circuit has already determined the standing question in this case. The new 'proof' and arguments offered by the Secretary do not vary the situation enough to merit an analysis differing from that given by the Eighth Circuit." 707 F.Supp. at 1083-84. The district court expressly denied summary judgment to the Secretary on the standing issue and, in granting summary judgment in favor of Defenders on the merits, necessarily determined, as a matter of law, the threshold issue of standing in favor of Defenders. It is, of course, "within the court's power to grant summary judgment sua sponte against the moving party, lacking a cross-motion, where the party against whom the judgment is entered has had a full and fair opportunity to contest that there are no genuine issues of material fact to be tried and the party granted judgment is entitled to it as a matter of law." Burlington N. R.R. v. Omaha Pub. Power Dist., 888 F.2d 1228, 1231 n. 3 (8th Cir.1989). We review this issue under the standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure. Defenders had the burden of showing "that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). See Lujan v. National Wildlife Fed'n, --- U.S. ----, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990).
 
 
 11
 The Secretary correctly states that a court's refusal to dismiss an action for lack of standing does not relieve the plaintiff of the burden of actually proving standing where a defendant contests the factual basis for standing. See National Wildlife Fed'n, 110 S.Ct. at 3189; Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 115, 99 S.Ct. 1601, 1615, 60 L.Ed.2d 66 (1979); Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 1927 n. 25, 48 L.Ed.2d 450 (1976); Munoz-Mendoza, 711 F.2d at 425; Glover River Org. v. United States Dep't of the Interior, 675 F.2d 251, 254 n. 3 (10th Cir.1982). We are satisfied, however, that Defenders had met its burden of proving standing at the summary judgment phase of the litigation. The district court did not merely reiterate our earlier analysis of the standing issue. It stated that it appreciated the distinction urged by the Secretary and recognized that "plaintiffs must prove their standing without the benefit of any inferences in their favor," 707 F.Supp. at 1083. In contrast, Defenders received the benefit of all favorable inferences when both this court and the court below considered the motion to dismiss. After remand, the court did not merely consider the bare allegations in the complaint but reexamined the evidence initially offered, the new evidence, and the record as a whole. The court concluded that the new evidence had not significantly changed the situation from that which we considered in the earlier appeal and thus, that Defenders had established standing.
 
 
 12
 Our own review of the record supports this conclusion. The affidavits of several Defenders' members established that they had visited, and planned to visit again, the endangered species or their habitat in the areas that may be affected by specific agency projects. In our earlier opinion, we noted that "[a]n interest in aesthetic, conservational, and recreational values will support standing when an organizational plaintiff alleges that its members use the area and will be adversely affected." 851 F.2d at 1040; see also United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973). In the prior appeal, we identified several foreign projects that had not been subjected to the consultation requirement and would not be in the future if the new regulation remained in effect. Amy Skilbred, a member of Defenders, stated in her sworn affidavit that she had visited Sri Lanka in order to observe its wildlife and animal habitat, and that she intended to return in the future for the same purpose. She stated that she would be harmed by the Mahaweli project in Sri Lanka, funded by the federal Agency for International Development (AID), because of its impact on wildlife. (Appellees' App. I at 169-71). In her deposition testimony, she also described her wildlife viewing activities in Sri Lanka, stated that she had visited the Mahaweli project, and expressed her intent to return to that area to view wildlife. Id. at 262-66.
 
 
 13
 Joyce Kelly, president of Defenders, stated in her sworn affidavit that she had visited Egypt and that she would suffer harm because of the Bureau of Reclamation's Aswan High Dam project. She expressed the intent to return to the area in the future. Id. at 114.
 
 
 14
 The Secretary offered additional evidence on the standing issue to the district court at the time of the parties' cross-motions for summary judgment. The court found that the proffered evidence was insufficiently probative to merit a conclusion other than that Defenders had standing. We agree because, as the court below observed, any dispute over a fact must be both material and genuine in order to defeat summary judgment. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We believe that the evidence raises no genuine issue of material fact concerning whether Defenders has suffered an injury in fact. We are aware of the Supreme Court's recent opinion in Lujan v. National Wildlife Fed'n and we believe that the evidence offered to support standing here meets the requirements of Rule 56, unlike that offered in National Wildlife Fed'n. Defenders has provided specific facts, as opposed to claiming use of unspecified portions of immense tracts of land upon which the governmental activity may or may not occur, as was the case in National Wildlife Fed'n. See 110 S.Ct. at 3187-89.[2]
 
 
 15
 Furthermore, Defenders has also satisfied the standing requirement by demonstrating a procedural injury based upon the Secretary's failure to follow the required consultation procedure. Defenders has set forth specific facts adequate to show procedural injury, has established that the benefits flowing from the procedures in issue are an objective of the statute, and has identified the agency action which is the source of its injuries, as required by National Wildlife Fed'n, id. at 3194. The Secretary argues, based upon City of Davis v. Coleman, 521 F.2d 661 (9th Cir.1975), that Defenders must prove a "geographical nexus" to the project sites in order to establish a procedural injury. Id. at 671. We reject this contention. Subsequent to City of Davis, the Ninth Circuit has decided cases which indicate that the geographical nexus test is not determinative. "In determining whether a given statutory duty creates a correlative procedural right, we look to the statutory language, the statutory purpose, and the legislative history." Fernandez v. Brock, 840 F.2d 622, 630 (9th Cir.1988); see also Dellums v. Smith, 797 F.2d 817, 821 (9th Cir.1986). When we apply the Ninth Circuit's procedural injury analysis here, we are persuaded that the Act is a statute imposing statutory duties which create "correlative procedural rights in a given plaintiff, the invasion of which is sufficient to satisfy the requirement of injury in fact in article III". Fernandez, 840 F.2d at 630.
 
 
 16
 As we observed in our earlier opinion, the Act "provides that 'any person' may commence a suit to enjoin any person who is alleged to be in violation of the ESA. See 16 U.S.C. Sec. 1540(g). Environmental associations are 'persons' and may bring suit in their own name." Defenders, 851 F.2d at 1039. The Act's ambitious purpose also supports a construction that Congress intended to bestow procedural rights upon environmental organizations such as Defenders. "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978) (emphasis added). The legislative history of the Act, which we will discuss in more detail when addressing the merits of the action before us, similarly supports this construction. "[T]he plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as 'incalculable.' " Id. at 187, 98 S.Ct. at 2298. The Supreme Court also declared that "[t]he pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." Id. at 185, 98 S.Ct. at 2297.
 
 
 17
 In sum, we are satisfied that, based upon Defenders' evidence of both substantive and procedural injury, it has established standing sufficiently to survive both a motion to dismiss and to prevail on summary judgment.
 
 II.
 
 18
 Having dealt with the threshold issue of standing, we now turn to the Secretary's argument that the language and legislative history of the Act show that Congress did not intend for the consultation requirement to apply to projects funded by the United States in foreign countries. The parties disagree as to whether the Secretary's interpretation of the Act, as revealed through its promulgation of the regulation at issue here, is entitled to deference by this court. The Supreme Court has spoken definitively on this issue:
 
 
 19
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 20
 Chevron U.S.A. v. Natural Resources Def. Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (footnotes omitted). Thus, we first examine the words of the Act itself in search of clearly expressed congressional intent.
 
 
 21
 The statute upon which the challenged regulation is based provides:
 
 
 22
 Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species....
 
 
 23
 16 U.S.C. Sec. 1536(a)(2). It cannot be denied that Congress has chosen expansive language which admits to no exceptions. Reduced to its simplest form, the statute clearly states that each federal agency must consult with the Secretary regarding any action to insure that such action is not likely to jeopardize the existence of any endangered species. We recognize, however, that the use of all-inclusive language in this particular section of the Act is not determinative of the issue. See Foley Bros. v. Filardo, 336 U.S. 281, 287-88, 69 S.Ct. 575, 578-79, 93 L.Ed. 680 (1949); United States v. Mitchell, 553 F.2d 996, 1003-04 (5th Cir.1977). We must search the Act further for clear expression of congressional intent.
 
 
 24
 The Supreme Court extensively discussed the Act's ambitious purpose in Tennessee Valley Authority v. Hill. "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute." 437 U.S. at 184, 98 S.Ct. at 2297 (emphasis added). The Court described the Act as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Id. at 180, 98 S.Ct. at 2295.
 
 
 25
 In the Act, Congress declared that "the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction." 16 U.S.C. Sec. 1531(a)(4). The Act lists various international agreements which guide this pledge. Id. Congress also committed itself to meeting the international commitments of the United States to existing conservation programs. Id. Sec. 1531(a)(5). The Act further declares one of its purposes is to take the appropriate steps to achieve the purposes of the international treaties and conventions just mentioned. Id. Sec. 1531(b).
 
 
 26
 The Act defines "endangered species" broadly and without geographic limitations. See id. Sec. 1532(6). Furthermore, the Act sets out a detailed procedure for determining whether a species is endangered. Id. Sec. 1533. This section states that the Secretary shall determine whether a species is endangered or threatened after taking into account "those efforts, if any, being made by any State or foreign nation ... to protect such species." Id. Sec. 1533(b)(1)(A). The Secretary is instructed to give consideration to species which have been designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement, and species identified as in danger of extinction by any State agency or by any agency of a foreign nation. Id. Sec. 1533(b)(1)(B)(i), (ii). Moreover, the Secretary is required to give actual notice to and invite comment from each foreign nation in which species proposed for listing as endangered are found. Id. Sec. 1533(b)(5)(B).
 
 
 27
 The Secretary is instructed to publish a list of all species found to be threatened. Id. Sec. 1533(c). Defenders asserts, and the Secretary does not contest, that "[a]s of May 1989, of 1,046 species listed as endangered or threatened, 507 were species whose range is outside the United States. In addition, there are 71 listed species whose range includes both United States and foreign territory." (Appellee's Brief at 4). The listing process does not distinguish between domestic and foreign species.
 
 
 28
 The Act contains a section entitled "International Cooperation" which declares that the United States' commitment to worldwide protection of endangered species will be backed by financial assistance, personnel assignments, investigations, and by encouraging foreign nations to develop their own conservation programs. 16 U.S.C. Sec. 1537. While the Secretary argues that this section and section 1538, dealing with imports and exports of wildlife, embody Congress' complete response to the international problem of endangered species, we are persuaded that this provision cannot be so neatly excised from the larger statutory scheme. Rather, we believe that the Act, viewed as a whole, clearly demonstrates congressional commitment to worldwide conservation efforts. To limit the consultation duty in a manner which protects only domestic endangered species runs contrary to such a commitment.
 
 
 29
 Based upon the foregoing examination of the Act as a whole, we are convinced that congressional intent can be gleaned from the plain language of the Act. Accordingly, we owe no deference to the Secretary's construction of the Act. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. Furthermore, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Id. at 843 n. 9, 104 S.Ct. at 2781 n. 9.
 
 
 30
 We believe that the answer to the extraterritorial issue can be found in the plain words of the statute. Our examination of the statute's legislative history, however, also reinforces our conclusion.
 
 
 31
 The original Environmental Species Act was enacted in 1973. Soon thereafter, the Secretary initiated a rulemaking process in order to implement the Act. In regard to the consultation requirement at issue here, the Secretary solicited comment from various agencies. Several agencies, including the Army Corps of Engineers, the State Department, and the Defense Department, expressed opposition to extraterritorial application. (Appellants' App. at 44-45, 52). The Council on Environmental Quality, the Interior Department Solicitor's Office, and the General Counsel's Office of the National Oceanic and Atmospheric Administration, however, took the position that the consultation duty extended to foreign countries. (Appellees' App. I at 53, Appellants' App. at 19, 21). After considering the extensive commentary, the Secretary concluded that Congress intended the duty to extend beyond the United States, and published a final rule on January 4, 1978, providing that:
 
 
 32
 Section 7 ... requires every Federal agency to insure that its activities or programs in the United States, upon the high seas, and in foreign countries, will not jeopardize the continued existence of a listed species.
 
 
 33
 42 Fed.Reg. at 4871 (1978) (emphasis added). At that time, the Secretary justified the extraterritorial application by stressing the Act's broad, inclusive language; its legislative history; and its policy implications. See Appellants' App. at 21-25.
 
 
 34
 After these regulations were issued, Congress amended the consultation section of the Act to reflect its present version. The amendment was essentially a reorganization to allow additions to the rest of the section. The conference report to these 1978 amendments indicates that no substantive changes were intended:
 
 
 35
 The conferees adopted Senate language creating a new section 7(a), which essentially restates section 7 of existing law, and outlines the responsibilities of the Secretary and other Federal agencies for protecting endangered species.... The Conferees felt that the Senate provision by retaining existing law, was preferable since regulations governing section 7 are now familiar to most Federal agencies and have received substantial judicial interpretation.
 
 
 36
 H.R.Rep. No. 1804, 95th Cong., 2d Sess. 18 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 9453, 9486 (emphasis added); see also Sierra Club v. Clark, 755 F.2d 608, 615 (8th Cir.1985) (stating that the Conference Report is an authoritative source of congressional intent). In light of the fact that the "existing law" at the time of the 1978 amendments included the prior regulation requiring consultation on foreign projects, we believe that the above language provides strong evidence of the conference committee's tacit approval of the prior regulation. The Secretary relies upon Securities & Exchange Commission v. Sloan, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978), for the proposition that we should be "extremely hesitant to presume general congressional awareness" of agency practices, based upon "a few isolated statements in the thousands of pages of legislative documents." Id. at 121, 98 S.Ct. at 1713. In light of the extensive commentary made by numerous agencies on the issue, however, we believe that it is highly unlikely that Congress was unaware of this state of the law.
 
 
 37
 Despite this evidence of congressional intent, in 1983, the Secretary issued a notice of proposed rulemaking to revise the regulation. The proposed regulation eliminated the need for consultation on foreign projects and defined "action" to exclude foreign activities. The Secretary attributed its radical shift on extraterritorial application to "the apparent domestic orientation of the consultation and exemption processes resulting from the [1978] Amendments, and because of the potential for interference with the sovereignty of foreign nations." (Appellants' App. at 84).
 
 
 38
 We are compelled to reject this justification. We recognize that "[a]n administrative agency is not disqualified from changing its mind," NLRB v. Local Union No. 103, Int'l Ass'n of Iron Workers, 434 U.S. 335, 351, 98 S.Ct. 651, 660-61, 54 L.Ed.2d 586 (1978), and that "substantial deference is nonetheless appropriate if there appears to be have been good reason for the change," Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 109 S.Ct. 1835, 1848, 104 L.Ed.2d 351 (1989). In this situation, however, the reasons offered for the change fall far short when examined in the context of the Act's language and legislative history previously discussed.
 
 
 39
 The Secretary places great emphasis upon the Act's treatment of the critical habitat clause, 16 U.S.C. Sec. 1536(a)(2), as support for its position. According to the Secretary, Congress could not have intended that the critical habitat provisions apply only to domestic projects while the consultation requirement extends to foreign projects. We are not persuaded. The Act reveals an intent to separately address the concerns raised by critical habitats and endangered species. The designation of critical habitat is governed by different procedures and standards than the listing of endangered species. See id. Sec. 1533(b)(2). Furthermore, we observe that the Secretary was not troubled by this alleged inconsistency when it promulgated its earlier regulation permitting differing geographic scopes of the two concerns. The evidence reveals that the consultation requirement and the critical habitat designation have been viewed as severable as to their geographical scope. See Appellants' App. at 18.
 
 
 40
 The Secretary claims that the domestic orientation of the consultation requirement is shown by the exemption provision, 16 U.S.C. Sec. 1536(e)-(p), added by the 1978 amendments. Specifically, the Secretary points out that exemptions are granted only if "the action is of regional or national significance," id. Sec. 1536(h)(1)(A)(iii), and require the weighing of public interests, id. Sec. 1536(h)(1)(A)(ii), which would be a gross intrusion upon the sovereignty of foreign nations. Again, we are unpersuaded. The exemption clauses provide that "the Governor of the State in which an agency action will occur, if any, ... may apply to the Secretary for an exemption." Id. Sec. 1536(g)(1); see also (g)(2)(B)(1)(i) (emphasis added). This language, when considered with the substantive and persuasive evidence previously discussed, leads us to conclude that the exemption provisions do not limit the consultation requirement geographically. The Secretary also identifies other provisions of the Act which purportedly limit the consultation duty. We have carefully considered these arguments and believe that they do not compel a different result here. They merit no further discussion.
 
 
 41
 To support its construction of the Act, the Secretary relies heavily upon the canon of statutory construction that statutes are presumed to have domestic scope only. See Foley Bros., 336 U.S. at 285, 69 S.Ct. at 577. To overcome the presumption that the statute was not intended to have extraterritorial application, there must be clear expression of such congressional intent. United States v. Mitchell, 553 F.2d at 1003. We are convinced that evidence of such intent is found both in the words of the Act and in its legislative history as previously set forth. This evidence leaves us with the belief that Congress intended for the consultation obligation to extend to all agency actions affecting endangered species, whether within the United States or abroad.
 
 
 42
 The Secretary also expresses concerns about the impact on foreign relations stemming from extraterritorial application of the consultation duty. It urges that such a construction would be viewed as an intrusion upon the sovereign right of foreign nations to strike their own balance between development of natural resources and protection of endangered species. We note initially that the Act is directed at the actions of federal agencies, and not at the actions of sovereign nations. Congress may decide that its concern for foreign relations outweighs its concern for foreign wildlife; we, however, will not make such a decision on its behalf.
 
 III.
 
 43
 The Secretary argues that we should also reverse the district court's award of attorney fees to Defenders if we reverse the court's holding on standing or the merits. The district court was authorized to award attorney fees pursuant to 16 U.S.C. Sec. 1540(g)(4). As we affirm the court's decision in all respects, we need not consider the Secretary's argument on the award of attorney fees.
 
 IV.
 
 44
 In conclusion, we affirm the district court's holding that Defenders had standing to challenge this regulation as contrary to congressional intent. We also affirm the court's holding that Congress intended that the Act's consultation requirement apply to projects in foreign nations, as well as to projects in the United States and upon the high seas. Accordingly, we also affirm the court's award of attorney fees to Defenders.
 
 
 
 [1]
 The Honorable Donald D. Alsop, Chief Judge for the United States District Court for the District of Minnesota
 
 
 [2]
 In National Wildlife Fed'n, the Supreme Court held that the allegations in the Peterson affidavit claiming use of land "in the vicinity of South Pass-Green Mountain, Wyoming," were insufficient to defeat summary judgment on standing. 110 S.Ct. at 3187, 3189. This claim was not specific enough because only 4500 acres of the two million acre area were affected by the challenged action. Id. at 3187-88. The Erman affidavit was similarly deficient because it claimed use of land "in the vicinity" of the Grand Canyon, the Arizona Strip, and the Kaibab National Forest. Id. at 3187. Of the 5.5 million acres of the Arizona Strip, only one-third were actually affected by the challenged action. Id. at 3188
 In contrast, the evidence here specifically identified the land areas visited which were the sites of the challenged agency projects. Skilbred stated that she visited the Mahaweli Project site in Sri Lanka and later confirmed that she was at that site by examining the AID Environmental Assessment. (Appellees' App. I at 269-70). Kelly stated that she had observed the traditional habitat of the Nile crocodile at the Aswan High Dam project in Egypt. Id. at 114.
 We believe that the testimony of J. Campbell Plowden in this case was insufficient, standing alone, to demonstrate standing for the same reason that the affidavits in National Wildlife Fed'n were insufficient. The evidence showed that Plowden came only within several hundred miles of the Picchis-Palcazu project in Peru. (Appellants' App. at 126).