Guadalupe ALVAREZ, et al., Plaintiffs-Appellants,

v.

Romulo Medina LONGBOY, a/k/a "Romie," Defendant-Appellee.

Guadalupe ALVAREZ, et al., Plaintiffs-Appellees,

v.

Romulo Medina LONGBOY, a/k/a "Romie," Defendant-Appellant,

and

Jose Lopez Garcia, a/k/a "El Rey," Defendant.

Nos. 80–5651, 80–5687.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1981.

Decided Feb. 2, 1983.

Cathy Christian, Robert K. Miller, Oxnard, Cal., for Alvarez.

Laurie A. Laws, Dressler, Stoll, Quesenbery, Laws & Barsamian, Newport Beach, Cal., for Longboy.

Before BROWNING, Chief Judge, ANDERSON, Circuit Judge, and MARQUEZ,[*] District Judge.

BROWNING, Chief Judge:

This appeal presents several questions regarding the interpretation of the Farm Labor Contractor Registration Act, 7 U.S.C. §§ 2041–2055 (1976).

Migrant workers are widely employed in the cultivation and harvesting of agricultural products. Growers secure migrant farm workers through the services of farm labor contractors or "crew leaders" who "are the middlemen in making work arrangements between farmworkers and growers and in this capacity often recruit, transport, supervise, handle pay arrangements, and otherwise act as an intermediary between the migrant worker and the farmer." S.Rep. No. 202, 88th Cong., 1st Sess. 1 (1963), *reprinted in* 1964 U.S.Code Cong. & Ad.News 3690.

Abuses by farm labor contractors led to enactment in 1963 of the Farm Labor Contractor Registration Act. Pub.L. No. 88–582, 78 Stat. 920 (1964). The Act required registration of labor contractors, and conditioned registration upon a showing of moral and fiscal responsibility. Crew leaders were required to inform workers at the time of recruitment regarding the area of employment, the crops and operators involved, the transportation, housing and insurance provided, the wage rates paid, and the charges made by the crew leader. Certain postings were to be made and certain records kept. Violations were punished by revocation of registration or criminal prosecution with a fine of up to $500.

By the early 1970's, it was apparent the Act had failed to achieve its objectives. Amendments were adopted in 1974 to correct its deficiencies. Three are directly relevant. Section 2045 of Title 7 was amended to require the contractor to disclose to workers at the time of recruitment the existence of any strike at the place of employment. This and other disclosures were required to be made "in writing in a language in which the worker is fluent."[1] Finally, provision was made in section 2050a for a private right of action by "[a]ny person claiming to be aggrieved," for "damages up to and including an amount equal to the amount of actual damages, or $500 for each violation, or other equitable relief."[2]

---

[*] Honorable Alfredo C. Marquez, District Judge, United States District Court for the District of Arizona, sitting by designation.

1. 7 U.S.C. § 2045 as amended reads in relevant part:

Every farm labor contractor shall—

. . . . .

(b) ascertain and disclose to each worker at the time the worker is recruited the following information to the best of his knowledge and belief:

. . . . .

(7) the existence of a strike or other concerted stoppage, slowdown, or interruption of operations by employees at a place of contracted employment. . . .

. . . . .

The disclosure required under this subsection shall be in writing in a language in which the worker is fluent, and written in a manner understandable by such workers on such forms and under such terms and conditions as the Secretary shall prescribe.

2. 7 U.S.C. § 2050a reads in full:

(a) Any person claiming to be aggrieved by the violation of any provision of this chapter or any regulation prescribed hereunder may file suit in any district court of the United States having jurisdiction of the parties without respect to the amount in controversy or without regard to the citizenship of the parties and without regard to exhaustion of any alternative administrative remedies provided herein.

(b) Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action. If the court finds that the respondent has intentionally violated any provision of this chapter or any regulation prescribed hereunder, it may

The plaintiffs are migrant farm workers and members of the United Farm Workers of America, AFL–CIO. They were employed by two growers against whom they and their union were on strike. The defendant is a farm labor contractor who furnished workers to the strike-bound growers to replace plaintiffs and other striking workers. Plaintiffs brought this action under section 2050a alleging defendant had failed to give the replacement workers written notice of the strike as required by section 2045(b)(7). The district court granted summary judgment for plaintiffs, awarding them the injunctive relief they sought, damages of $150 each, and attorney's fees of $7,500. Plaintiffs appeal the portion of the judgment awarding them $150 instead of $500 each. Defendant cross-appeals, contending plaintiffs lacked standing, and that summary judgment, the award of damages, and the award of attorney's fees were improper.

## I

### Standing

Defendant argues plaintiffs lack standing because the interest plaintiffs sue to protect is not "within the zone of interests to be protected" by the Act, and because plaintiffs failed to prove "injury in fact." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152, 153, 90 S.Ct. 827, 829, 830, 25 L.Ed.2d 184 (1970).

In defendant's view the Act is concerned primarily with the relationship between each farm labor contractor and that contractor's "crew" of migrant workers, and secondarily with the relationship between the workers and the grower who purchases their services. Defendant contends the Act was not intended to protect persons, like plaintiffs, who had no business relationship with the particular labor contractor accused of violating the Act.

■ We believe the Act "can be understood as granting persons in the plaintiff[s'] position a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). The language and purpose of the Act are broad enough to extend relief to such persons, and the legislative history strongly suggests that coverage of persons in plaintiffs' position was in fact intended.

The Act "is remedial and should be broadly construed." *Marshall v. Coastal Growers Association,* 598 F.2d 521, 525 (9th Cir.1979). Section 2050a(a) authorizes suit by "[a]ny person claiming to be aggrieved" by a violation of the Act. This language is patterned after language defining standing under federal Civil Rights statutes,[3] and has been viewed in that context as "broad and inclusive," *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366–367, 34 L.Ed.2d 415 (1972), and as "show[ing] 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution.'" *Id.,* quoting *Hackett v. McGuire Brothers,* 445 F.2d 442, 446 (3d Cir.1971).

The Act's declaration of policy recognizes that irresponsible contractors victimize not only their own "crews" but growers, migrant workers, and the public generally, 7 U.S.C. § 2041(a). Section 2045(f) of the Act also undercuts defendant's argument that only persons who are objects of a contractor's violation can sue to enforce the Act. Migrant workers hired by a contractor in violation of the prohibition against "recruiting, employing, or utilizing, with knowledge, the services of any person who is an alien not lawfully admitted for permanent residence or who has not been authorized by the Attorney General to accept employment," could not themselves sue for the violation.

---

award damages up to and including an amount equal to the amount of actual damages, or $500 for each violation, or other equitable relief. Any civil action brought under this section shall be subject to appeal as provided in chapter 83 of Title 28.

**3.** *See Farm Labor Contractor Registration Act Amendments of 1973: Hearings on H.R. 7597 Before the Subcomm. on Agricultural Labor of the House Comm. on Education and Labor,* 93d Cong., 1st Sess. 112 (1973) (statement of Rep. Ford) [hereinafter cited as *Hearings*].

It is a natural inference that section 2045(b)(7)'s requirement that a labor contractor provide written notice to migrant workers that a strike exists at the place at which the workers are to be employed was intended for the benefit of the strikers as well as the recruited workers, or, more accurately, for the benefit of the whole body of migrant workers. This inference is strongly supported by the legislative history.

Legislative consideration of the amendments of the Act began with the introduction of H.R. 7597 on May 8, 1973. 119 Cong.Rec. 14621. H.R. 7597 did not contain the provision now found in section 2045(b)(7). Hearings on the bill were held before the Subcommittee on Agricultural Labor of the House Committee on Education and Labor. In the course of the hearings, Father James Vizzard, S.J., legislative representative of the United Farm Workers, AFL–CIO, offered evidence in support of the thesis that a strong and active union of migrant workers was necessary to the enforcement of the Act, and that efforts to form and maintain such a union were impeded by the recruitment of migratory workers by farm labor contractors to replace migratory workers who were on strike. Evidence was offered that labor contractors had failed to inform recruited workers of the existence of strikes, and, if they had done so, that the workers would not have agreed to accept the employment.[4] Daniel Pollitt, special counsel to the subcommittee, asked Father Vizzard whether it would help solve this problem to add to section 2045(b) a requirement that the labor contractor inform migrant workers "whether or not there is a strike going on or whether a contract is at its last stages of negotiations." Father Vizzard replied that it would.[5] The subcommittee then modified the proposed bill to include the amendment of section 2045(b) requiring labor contrac-

tors to inform workers whether a labor dispute existed in the area of contracted employment. H.R.Rep. No. 1024, 93d Cong., 2d Sess. 7, 12 (1974).

Thus, this requirement of section 2045(b)(7) was added to the Act to assist those seeking through strike action to further formation of a strong union of migrant workers. During House debate this was made explicit by Congressman James G. O'Hara, a member of the subcommittee and co-sponsor of the bill. The congressman remarked that "[e]vents in recent years have shown us that unionization of farmworkers is an important part of any program to achieve better wages and living conditions," and then pointed out that under the bill "a crew leader must inform a worker at the time of contracted employment of any labor dispute at the workplace." Congressman O'Hara expressed the view that the problems of farmworkers would not be solved "until [they are] able to exercise to the fullest possible extent [their] right to organize and bargain collectively over wages and working conditions." 120 Cong.Rec. 13405 (1974).[6]

In light of this background, it is clear the requirement that labor contractors inform workers recruited for employment that a strike existed at the intended place of employment was intended primarily to protect the interests of workers like plaintiffs, who were engaged in a work stoppage to further union organization and collective bargaining.

Plaintiffs alleged an invasion of precisely the interest section 2045(b)(7) was intended to protect. Thus, plaintiffs alleged defendant's failure to give replacement workers written notice of the existence of the strike "endangers the efforts of workers engaged in lawful organizational and collective bargaining activity," and if such activity is continued, "plaintiffs will be exploited and unable to assert their rights because lawful

---

**4.** *Hearings* at 65, 67, 68, 69, 74, 83, 86.

**5.** *Hearings* at 92.

**6.** A bill introduced by Senator Kennedy would have gone farther, requiring labor contractors

to refrain from recruiting workers for agricultural employment where the employment was the subject of a strike and the effect of the recruitment was to interfere with the strike. S. 3336, 93d Cong., 2d Sess. § 2(i) (1974).

organizational and collective bargaining activity will be made much more difficult."

Striking farm laborers are more likely than any other group to commence and vigorously pursue private suits to enforce this provision of the Act. The recruited worker may be inconvenienced or embarrassed by lack of notice of the pending labor dispute, but only the strikers' jobs are at stake. The primary purpose of the 1974 amendments was to improve the enforcement of the Act, and central to this effort was the creation of a private cause of action.[7] The statute is given vitality by a construction that allows standing to those strongly motivated to seek its enforcement. *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. at 211–12, 93 S.Ct. at 367–368.

Defendant argues that plaintiffs did not show they were injured in fact by defendant's failure to give recruited workers written notice of the existence of the strike. Section 2045(b)(7) creates the right to have such written notice given. Plaintiffs were in the group of persons the right was created to protect. Invasion of the right was sufficient injury to establish standing in such persons; no other injury was required. "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973).

## II

### Merits

◼ Defendant admits written notice of the existence of the strike was not given to workers recruited to replace plaintiffs and others, but argues that summary judgment was nonetheless improper because plaintiffs failed to establish that defendant "intentionally" violated the Act. We agree with the Seventh Circuit that "the term 'intentional' in section 2050a(b) means conscious or deliberate and does not require a specific intent to violate the law." *Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1224 (7th Cir. 1981). This construction is supported by the language used by Congress when it wished to require specific intent as a condition to imposing criminal penalties under the Act ("willfully and knowingly"), 7 U.S.C. § 2048(a), and by the meaning given "intentional" in other remedial statutes. *See, e.g., Clark v. Marsh,* 665 F.2d 1168, 1175 n. 8 (D.C.Cir.1981); *Schaeffer v. San Diego Yellow Cabs, Inc.,* 462 F.2d 1002, 1006 (9th Cir.1972).[8]

Since defendant did not claim his failure to give written notice was accidental, summary judgment was appropriate.

## III

### Damages

Section 2050a(b) provides that if, in a private suit authorized by section 2050a, the court finds, as in this case, that the defendant has intentionally violated "any provision of this chapter or any regulation prescribed hereunder," the court "may award damages up to and including an amount equal to the amount of actual damages, or $500 for each violation, or other equitable relief."

The district court awarded each of the 92 plaintiffs $150 and enjoined defendant from recruiting workers without first informing them in writing of the existence of any

---

7. *See, e.g.,* H.R.Rep. No. 1024, 93d Cong., 2d Sess. 5–6 (1974); S.Rep. No. 1295, 93d Cong., 2d Sess. 3, *reprinted in* 1974 U.S.Code Cong. & Ad.News 6441, 6443; 120 Cong.Rec. 13403–05 (1974) (statements of Rep. Ford & Rep. O'Hara); 120 Cong.Rec. 33746 (1974) (statement of Sen. Williams).

8. We are not impressed with defendant's argument that omission of any specification of intent in § 2048(b)(1) (which imposes a civil penalty upon "[a]ny person who commits a viola-

tion of this chapter") requires reading the word "intentional" in § 2050a(b) as connoting something more than mere negligence. There is also no mention of intent in § 2048(c), imposing a criminal penalty for violation of § 2045(f), apparently because § 2045(f) contains its own requirement of scienter, namely, that the prohibited act be done "with knowledge." Section 2048(b)(1) is also derivative and is to be read as requiring whatever scienter is required for the underlying "violation of this chapter."

labor dispute or strike at any area or field where they might be asked to work.

Both plaintiffs and defendant appeal the monetary award. Plaintiffs contend they were entitled to $500 each; defendants contend plaintiffs were entitled to nothing.

Plaintiffs' argument is that the language and legislative history of section 2050a(b) indicate that a person aggrieved by a violation of the statute who cannot, or chooses not to, prove actual damages is entitled to $500 per violation as statutory or liquidated damages, and the court has no discretion to award less.

Plaintiffs argue that the statute is unambiguous—that the phrase "may award damages up to" can only be read as applying solely to the provision for actual damages and not also to the clause providing for $500 in statutory damages.

Obviously, the words are equally subject to the construction that the court has discretion as to the amount to be awarded in either actual or statutory damages. Plaintiffs' argument rests entirely upon the placement of the commas. In this instance at least, the statutory punctuation is not so reliable as to bar further inquiry into the legislative intent, particularly in view of the many modifications this provision underwent during the legislative process. *See Alvarez v. Joan of Arc, Inc.*, 658 F.2d at 1224.

We agree with plaintiffs that the legislative history clearly establishes Congress wished to strengthen the enforcement of the Act, and regarded the private remedy created by section 2050a as an important means of accomplishing this purpose. But this general intent offers little guidance to Congress's intention on the specific issue of whether the provision for $500 in statutory damages establishes a fixed award or a ceiling.

The various versions of the proposal cut in both directions.[9] Senate Report 1295, which accompanied the final bill, uses the language "up to $500," but as plaintiffs point out, this may have reflected an earlier version to which the report was originally attached.[10] The matter was not discussed in the committee hearings or on the floor of either house.

Plaintiffs point out that in other provisions of the statute statements as to the damages allowable are preceded by "not to exceed" or "not more than" (see sections 2048(a), 2048(b)(1), 2048(c)), and argue that the omission of similar language in section 2050a(b) must be treated as significant. But the provisions referred to impose fines or penalties. In that context the commonly understood rule of strict construction requires greater specificity.

In the absence of more persuasive evidence to the contrary, we conclude that plaintiffs' construction is not in accordance with probable congressional intent.

Section 2050a(b) clearly allows the trial court to award judgment for less than the amount of the actual damage proved by the evidence to have resulted from a violation of the Act. It would be anomalous for Congress to give the court discretion with respect to the amount of the award where actual damage is proven and to deny that discretion where it is not.

Plaintiffs' construction would require a rigidity in enforcement of the statute that is not necessary to accomplish Congress's general purpose to encourage effective enforcement, and might well create anoma-

**9.** *Compare* H.R. 13342, 93d Cong., 2d Sess. § 17, 120 Cong.Rec. 13403 (1974) (allowing damages "up to and including $500") *and* S.Rep. No. 1295, 93d Cong., 2d Sess. 21, *reprinted at* 1974 U.S.Code Cong. & Ad.News 6450 (S. 3202 allowing "damages up to $500 for each violation") *with* S. 3336, 93d Cong., 2d Sess. § 17 (1974) (allowing the greater of three times wages not paid or $500).

**10.** Except for the discussion of "History of the Legislation" and the substitution of bill numbers, the language of Senate Report 1206 accompanying H.R. 13342, an earlier version of the bill which was vetoed by President Ford because of an unrelated rider, and Senate Report 1295 accompanying S. 3202, the enacted version, are identical. *Compare* S.Rep. No. 1206, 93d Cong., 2d Sess. (1974), *with* S.Rep. No. 1295, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 6441.

lous results Congress could not have intended, and which might impede effective enforcement of the Act. The number of potential plaintiffs in these cases may be large, particularly in suits by striking workers. There are 92 plaintiffs in this action. Moreover, in a case such as this, both strikers and recruited workers may sue for a single violation. More than one violation of the numerous requirements in the statute and regulations may be involved in a single case—four were alleged in this suit. And violations may be essentially technical. There was uncontradicted evidence in this case that the required notice was given orally—the violation is that the notice was not written. *See also, Alvarez v. Joan of Arc, Inc.,* 658 F.2d at 1224 (inadvertent delay in registration). A *rigid reading of* section 2050a(b) might compel the imposition of a penalty disproportionate to the offense. *See De La Fuente v. Stokely-Van Camp, Inc.,* 514 F.Supp. 68, 80 & n. 5 (C.D. Ill.1981). Courts faced with this consequence of a finding that the statute had been violated would inevitably interpret the substantive requirements strictly and impose a stringent standard of proof, thus making achievement of the statute's remedial purpose more difficult.

■ Defendant asserts the language "$500 for each violation" must be read to limit awards under this clause to a maximum of $500 for each illegal act by the contractor. We disagree. The Act focuses on the contractor's actions where it provides for penalties. *See* 7 U.S.C. § 2048. Section 2050a is remedial, and awards under it are therefore appropriately tied to the number of injured migrant workers. Construing the Act to allow the district court to award less than $500 adequately insures against disproportionately large awards when the number of migrant workers is large.

■ Plaintiffs argue that even if the court had discretion to award less than $500, it was an abuse of discretion to award each plaintiff only $150. Defendant, on the other hand, argues that there is no support in the record for any award at all. We think the amount of the award was well within the court's discretion. Defendant unquestionably violated the statute by failing to give notice in writing. Although the violation was relatively minor, it was not insignificant. It is difficult to assure that an oral notice has in fact been given and that its contents were adequate. A recovery of $150 by each plaintiff, though small, was not unrelated to the uncertain damage each may have suffered from the particular violation, while the total judgment of over $13,000 was large enough to encourage future compliance by the defendant.

## IV

### Attorney's Fees

■ The district court awarded plaintiffs $7,500 in costs and attorney's fees. Defendant challenges the award for attorney's fees. Federal courts may award attorney's fees to prevailing litigants where a statute authorizes such fees, *see Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 254–55, 95 S.Ct. 1612, 1620–1621, 44 L.Ed.2d 141 (1975); where the fees were paid by a trustee of a fund or property, or by a party preserving or recovering a fund for the benefit of others in addition to himself, *see id.* at 257–58, 95 S.Ct. at 1621–1622; or where the losing party has been guilty of bad faith or has disobeyed a court order. *See id.* at 258–59, 95 S.Ct. at 1622. Plaintiffs contend the trial court properly awarded attorney's fees (1) because Congress intended to provide for attorney's fees, and (2) because defendant's defense was in bad faith.

■ Section 2050a(b) provides "the court may appoint an attorney" for a complainant under the Act. There is no provision for attorney's fees where complainants independently engage an attorney. An earlier version of the Act contained a provision for attorney's fees, but it was deleted in the version finally enacted on the ground that existing law allowed recovery of attorney's fees where such fees were appropriate. *See* 120 Cong.Rec. H10521 (daily ed. Oct. 11, 1974) (statement of Rep. Ford); 120 Cong. Rec. 35902 (1974) (statement of Sen. Wil-

liams). We recognize that the authority of the courts to award attorney's fees may have appeared broader in 1974 than the Supreme Court held it to be in *Alyeska, see* 421 U.S. at 272–88, 95 S.Ct. at 1629, 1636–1637 (Marshall, J., dissenting). Nonetheless, we conclude it would "invade the legislature's province" to read such authority into this Act without some evidence in the language or legislative history to support it. *Id.* at 271, 95 S.Ct. at 1628.

■ In the trial court plaintiffs argued that an award of attorney's fees was justified because defendant had acted in bad faith in forcing extensive litigation to obtain relief for a clear violation of the Act. The trial court did not state its reason for awarding attorney's fees. We cannot determine on the record before us whether an award based on bad faith, the only relevant permissible reason for awarding fees in this case, would be justified. Clearly the fact that defendant's violation was "intentional" within the meaning of the Act is not sufficient by itself to establish bad faith in defending the suit. We vacate and remand for the trial court to reconsider the award of attorney's fees in light of this opinion.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

MARQUEZ, District Judge, Sitting by Designation, concurring:

Although I agree with the majority's conclusion, I would emphasize that 7 U.S.C. § 2050a vests a great deal of discretion in the trial court.

Under the rule *noscitur a sociis* the intent of a specific word becomes clearer by reference to other words associated with it. *United States v. Sumitomo Shoji, New York, Inc.,* 534 F.2d 320, 322 (Cust. & Pat. App.1976). In the majority opinion the intent requirement and the liquidated damages provision were interpreted independently of each other.

The operative word in 7 U.S.C. § 2050a is "may". That word has been interpreted, depending on its context, to vest discretionary power in the court. *United States v.*

*Cook,* 432 F.2d 1093, 1098 (7th Cir.1970). In the instant case an award of damages is dependent on the nature of a respondent's actions. A court can deny an award of damages if the respondent's actions were accidental, innocent or merely negligent. In essence, an award of damages is not mandatory. Damages are mandated only when an irresponsible contractor's actions "exploit producers of agricultural products, migrant agricultural laborers and the public generally" as defined under 7 U.S.C. § 2041.