Santiago **HERRERA**, Armando **Andres**, Luciano **Andres**, Jesus **Andres Torres**, Bertoldo **Garcia**, Roberto **Gonzalez**, Jose R. **Nicolas**, Jose de Jesus **Ortiz**, Pedro **Ybarra** and Joseph **Romero**, individually, Plaintiffs,

v.

Jarnail **SINGH** d/b/a Ram Farms, a partnership, Defendant.

No. CS–98–0380–WFN.

United States District Court, E.D. Washington.

June 13, 2000.

Rob Williamson, Williamson & Williams, Seattle, WA, Joachim Morrison, Columbia Legal Services, Wenatchee, WA for Plainitffs.

Michael A. Arch, Foreman, Arch, Dodge, Volyn & Zimmerman, P.S., Wenatchee, WA, for Defendant.

## ORDER

WM. FREMMING NIELSEN, Chief Judge.

A hearing on post-trial matters was held on June 9, 2000. Joachim Morrison and Roblin Williamson telephonically participated on behalf of Plaintiffs; Michael Arch participated in person on behalf of Defendant. This Order is entered to memorial-

ize and supplement the oral rulings of the Court.

This matter is briefly summarized as follows. Plaintiffs are ten migrant farm workers, and Defendant Jarnail Singh, doing business as Ram Farms, is an agricultural employer with orchards in Chelan and Mattawa, Washington. In September, 1997, all Plaintiffs briefly were employed by Defendant to pick apples. At trial, Plaintiffs presented claims that the Defendant violated various sections of the Migrant and Seasonal Agricultural Worker Protection Act [AWPA], 29 U.S.C. §§ 1801, *et seq.*, and wrongfully terminated Plaintiffs' employment in violation of the public policy of the State of Washington as expressed in R.C.W. 49.30.020. Defendant presented counterclaims for the torts of assault and trespass. All claims except the counterclaim for trespass went to the jury. On April 21, 2000, the six person jury returned a Special Verdict almost entirely in favor of Plaintiffs. The jury found that Defendant did not qualify for the family business exemption to the AWPA, and that the Defendant committed nine of the ten AWPA violations alleged. The jury also found that the Defendant wrongfully discharged and terminated the Plaintiffs in violation of the public policy of the State of Washington. Additionally, the jury found that none of the Plaintiffs trespassed on the Defendant's property.

During the final pretrial conference, the parties stipulated that the Court should determine the amount of statutory damages, if any, awarded for any AWPA violations found. Plaintiffs' Request for AWPA Statutory Damages, Ct. Rec. 99, currently is before the Court. Also addressed during this hearing was Plaintiffs' Request for Prejudgment Interest, Attorneys' Fees, and Imposition of Monetary Sanctions (Ct. Rec.100).

## STATUTORY DAMAGES AWARD FOR AWPA VIOLATIONS

Plaintiffs alleged ten AWPA violations. The jury found that the Defendant violated nine AWPA provisions. The nine separate AWPA sections violated by Defendant are:

1. Failure to disclose in writing certain terms of employment at the time of a worker's recruitment (29 U.S.C. § 1821(a));

2. Provision of knowingly false or misleading information regarding terms and conditions of employment (29 U.S.C. § 1821(f));

3. Violation of the terms of the working arrangement (29 U.S.C. § 1822(c));

4. Failure to comply with substantive federal and state safety and health standards applicable to worker housing owned or controlled by the employer (29 U.S.C. § 1823(a));

5. Failure to obtain certification by a state or local health authority that worker housing meets applicable safety and health standards (29 U.S.C. § 1823(b)(1));

6. Failure to comply with requirements to post in a conspicuous place the terms and conditions of occupancy of worker housing (29 U.S.C. § 1821(c));

7. Failure to keep and maintain accurate payroll records (29 U.S.C. § 1821(d)(1));

8. Failure to provide workers with an itemized written statement of required payroll information for each pay period (29 U.S.C. § 1821(d)(2)); and

9. Failure to post in a conspicuous place the rights provided by the AWPA (29 U.S.C. § 1821(b)).

The one alleged AWPA violation that the jury did not find existed was violation of the terms of the working arrangement held with each worker when Defendant paid each Plaintiff a piece rate of $8.50 per bin of apples picked (29 U.S.C. § 1822(c)).

The parties agree that the Court may impose a maximum statutory award of $500 per Plaintiff per violation. 18 U.S.C. § 1854(c)(1). The maximum possible total award would be $45,000 in AWPA damages. Plaintiffs ask for $250 per Plaintiff for violation of the working arrangement pursuant to § 1822(c), and $250 per Plaintiff for the failure to post the terms and

conditions of occupancy of worker housing pursuant to § 1821(c). Plaintiffs request the maximum $500 statutory damages per Plaintiff for all seven other AWPA violations. In opposition, Defendant suggests a total damages award of $1,550 per Plaintiff, or $15,500 for all ten Plaintiffs. Defendant suggests a maximum of $100–$250 per Plaintiff per violation.

■ The AWPA provides for an award of statutory damages for each Plaintiff for each violation:

> If the court finds that the respondent has intentionally violated any provision of this Act or any regulation under this Act, it may award damages up to and including an amount equal to the amount of actual damages, or statutory damages of up to $500 per plaintiff per violation or other equitable relief, except that (A) multiple infractions of a single provision of this Act or regulations under this Act shall constitute only one violation for purposes of determining the amount of statutory damages due a plaintiff ....

29 U.S.C. § 1854(c)(1). A plaintiff need not show actual injury to recover statutory damages. *Martinez v. Shinn,* 992 F.2d 997, 999 (9th Cir.1993).

■ In determining the amount of damages to be awarded, a court "is authorized to consider whether an attempt was made to resolve the issues in dispute before the resort to litigation." 29 U.S.C. § 1854(c)(2). The Ninth Circuit has adopted additional factors to consider when determining an appropriate award: (1) the amount of award to each plaintiff; (2) the total award; (3) the nature and persistence of the violations; (4) the extent of the defendant's culpability; (5) damage awards in similar cases; (6) the substantive or technical nature of the violations; and (7) the circumstances of each case. *Martinez,* 992 F.2d at 999. Overall, an award of damages should be designed to effectuate the dual purposes of the AWPA: (1) to promote enforcement of the Act and deter violations, and (2) to compensate injuries of farm workers. *Martinez,* 992 F.2d at 999, *quoting Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1309 (9th Cir.1990).

An appropriate aggregate award strikes a delicate balance. It should not be cheaper to violate the AWPA and be sued than to comply with statutory requirements, and awards should be adequate to encourage workers to assert their statutory rights. *Beliz,* 765 F.2d at 1332–33. The compensatory element recognizes that workers incur costs in bringing suit, and that "workers who attempt to assert their rights must overcome a general background of fear and intimidation caused by the widespread practice of retaliation against those who complain about violations." *Beliz v. W.H. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1332 (5th Cir. 1985). However, the Ninth Circuit prohibits imposition of a penalty disproportionate to the defendant's offense. *Martinez,* 992 F.2d at 999, *quoting Six Mexican Workers,* 904 F.2d at 1309 and *Alvarez v. Longboy,* 697 F.2d 1333, 1340 (9th Cir.1983).

■ An AWPA violation must be "intentional" for an award of damages to be available. No party argues the intentionality of the violations. "Intentional" actions under § 1854(c) must be only "conscious or deliberate and [do] not require a specific intent to violate the law." *Alvarez,* 697 F.2d at 1338, *quoting Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1224 (7th Cir.1981). This finding was made in relation to the Farm Labor Contractor Registration Act [FLCRA], the predecessor to the AWPA, but there is no evidence Congress intended to change the meaning of the word "intentional" as used in the damages statute. Defendant's actions were intentional within the meaning of the AWPA.

***Total Award is not "Disproportionately Punitive."*** The parties argue both the propriety of the total award amount, and the amount of the award for individual violations. The aggregate award is discussed first.

■ The Ninth Circuit has established that an aggregate award under the AWPA

may not be "disproportionately punitive." *Six Mexican Workers,* 904 F.2d at 1309. Specifically, that court found that "[w]hen the class size is large, individual awards will be reduced so that the total award is not disproportionate." *Id.* In *Six Mexican Workers,* a class of 1,349 undocumented workers were awarded an unprecedented $1,846,500 in aggregate damages. This amount exceeded that necessary to enforce the AWPA or to deter future violations. *Id.,citing Alvarez,* 697 F.2d at 1340.

Several observations regarding *Six Mexican Workers* are relevant in comparison to the instant case. First, the *Six Mexican Workers'* decision contains no evidence that those plaintiffs were required to travel any great distance to achieve employment with defendant Arizona Citrus Growers. Plaintiffs in the instant case traveled approximately 1,000 miles to achieve employment with Defendant. It is recognized that one of the harms that the AWPA is designed to combat is the plight of migrant workers who, by the nature of their work, travel long distances and stand at the mercy of employers who may attempt to renege on the offer of employment or vary the terms or conditions of that offer. *See, e.g., Flores v. Rios,* 36 F.3d 507, 516 (6th Cir.1994).

Second, *Six Mexican Workers* was decided in 1990, and addressed violations that occurred during the 1976–77 picking season. The bench trial at which damages were awarded occurred in 1984. The intervening 16 years between the *Six Mexican Workers'* decision and this Court's determination of statutory damages have witnessed a dramatic change in the value of money. While an individual class member award of between $400 and $1,600 may have over-compensated a plaintiff for a few hours work in 1984, that award would be much less significant today.

Third, and most importantly, the *Six Mexican Workers* court viewed the nearly $2 million award as disproportionately punitive because deterrence objectives could be achieved with a substantially lower aggregate award. The court specifically noted that a large class size requires individual rewards to be reduced. *Six Mexican Workers,* 904 F.2d at 1309, *citing Alvarez,* 697 F.2d at 1340 (considering a total of 92 plaintiffs). The class was comprised of 1,349 workers. In the instant case, there are only ten Plaintiffs, each of whom suffered nine violations of the AWPA.

■ Plaintiffs convincingly argue that Defendant's lack of candor, combined with the nature and persistence of the violations, merits up to a total award of $4,000 per Plaintiff and an aggregate award of $40,000. They note that the damages sought for individual violations are higher than those awarded in similar cases, but the aggregate award is less. *See, e.g., Martinez,* 992 F.2d at 1000–01 (holding an aggregate award of $64,000 to 40 plaintiffs was not disproportionately punitive). Here, fewer Plaintiffs request a lesser aggregate award for more numerous and egregious violations.

■ In opposition, Defendant argues that a large award of damages would serve an improper punitive purpose because testimony showed the AWPA violations have been corrected. The Court makes two observations. First, the Ninth Circuit does not prohibit an award of statutory damages from containing a punitive purpose. Indeed, one of the stated purposes of the AWPA is to promote enforcement of its provisions and to deter violations. An award of damages designed to deter future violations naturally implies some component of punishment for current ones. The Ninth Circuit only prohibits imposition of a penalty disproportionate to the offense. *Six Mexican Workers,* 904 F.2d at 1309, *citing Alvarez,* 697 F.2d at 1340. Second, testimony at trial suggested recent attempts to comply with the AWPA. However, no testimony proved that all violations have been completely corrected. Furthermore, as discussed later in more detail, the persistent and pervasive nature of Defendant's violations raises a concern of regression. An aggregate award of up to $40,000 for ten Plaintiffs suffering nine violations

each is not disproportionately punitive, hopefully is significant enough to deter future violations, and assists in compensating the Plaintiffs.

The parties address individual violations separately or in groups. This memo will address the appropriate award for each violation in the same fashion.

■ *Written Disclosure Requirements (29 U.S.C. § 1821(a)) and Knowing Provision of False or Misleading Information (29 U.S.C. § 1821(f)).* These two provisions relate to the recruitment of the Plaintiffs as employees. Section 1821(a) requires an agricultural employer to disclose at the time of recruitment certain information in writing to each worker recruited for employment. Section 1821(f) prohibits knowing provision of false information on any of the disclosures required by § 1821(a). Plaintiffs argue that failure to provide written disclosures allowed the Defendant to recruit workers from California with illusory promises of high wages. The Defendant could attempt to change the terms of employment once Plaintiffs were a long distance from home. In opposition, Defendant contends that his failure to provide upon recruitment written disclosure of the terms and conditions of employment is a technical violation when those terms were disclosed orally. *See, Alvarez,* 697 F.2d at 1340.

In *Alvarez,* there "was uncontradicted evidence ... that the required notice was given orally." *Id.* Nonetheless, the court found the violation was not insignificant because it was difficult to assure that an oral notice has in fact been given and that its contents were adequate. *Id.* Here, the testimony was that Plaintiffs were promised $10–$12 per bin of apples picked. When they arrived, they were informed the price was $8.50 a bin. Additionally, Plaintiffs were promised work on a certain date, and in a certain location. Neither of these oral promises were fulfilled. Defendant even attempted to disown oral representations regarding employment made by his own foreman. The dangers presented by an oral representation plainly are pres-

ent in this case. *See, e.g., Flores,* 36 F.3d at 516 (finding migrant workers who travel long distances for employment are at the mercy of employers). An award of $500 for each of these violations is appropriate.

■ *Violation of the Terms of the Working Arrangement (29 U.S.C. § 1822(c)).* This provision prohibits an agricultural employer from violating without justification the terms of a working arrangement made with a migrant worker. Plaintiffs request $250 per Plaintiff for this violation, while Defendant contends $100 per Plaintiff is more appropriate. Specifically, Defendant argues that an award of statutory damages for this violation provides a double recovery because the Plaintiffs recovered their lost wages through their wrongful discharge claim. However, the AWPA does not expressly or implicitly exclude an award of statutory damages in addition to an award for actual damages for violation of state law. *Martinez,* 992 F.2d at 1001. "While the statutory damage award was intended to compensate the plaintiffs for not receiving timely payment and to deter the defendants from withholding timely payment in the future, the back pay award compensated plaintiffs for [defendants'] failure to pay the wages they were obligated to pay ...." *Martinez,* 992 F.2d at 1001 (internal quotations omitted). In the instant case, Plaintiffs were compensated for wrongful discharge stemming from the same set of facts. They have been compensated for their losses due to Defendant's wrongful action, but the recovery of lost wages addresses a different purpose than the AWPA. An award of $200 per Plaintiff is appropriate when balancing these considerations.

■ *Housing Safety and Health Standards (29 U.S.C. § 1823(a), Certification of Housing (29 U.S.C. § 1823(b)(1)), and Posting of Terms and Conditions of Occupancy (29 U.S.C. § 1821(c)).* Agricultural employers who provide housing for migrant workers must ensure that the housing facilities comply with substantive, applicable federal and

state safety and health standards. 29 U.S.C. § 1823(a). An employer may not permit migrant workers to reside in his housing until he obtains appropriate certification that the applicable standards are met. 29 U.S.C. § 1823(b)(1). Additionally, an employer must conspicuously post any terms and conditions of occupancy of the housing. 29 U.S.C. § 1821(c).

Plaintiffs request $500 for each of the first two violations, and $250 for the third violation. In support of this substantial award, they cite the testimony of Washington State Department of Health official Natalie Gonzalez. Ms. Gonzalez oversees health and safety standards compliance for approximately 200 agricultural employers in the relevant geographic area. She stated that the Defendant is one of the worst temporary housing providers in Washington, falling into the bottom two percent of all employers. Ms. Gonzalez discussed a pattern of serious housing defects existing over a nearly ten-year period, including drinking water contaminated with certain types of E-coli bacteria, the presence of rodents, and limited, filthy bathroom facilities. During various visits to the Defendant's housing, Ms. Gonzalez noted exposed wires, over-crowding, few or no cooking facilities, and over-flowing garbage. Ms. Gonzalez even testified that she attempted to shut down Defendant's housing at one time when a pregnant woman and her toddler child were residing in it because the woman and child were safer living on the streets than in Defendant's housing. In opposition, Defendant notes that Plaintiffs suffered no physical injuries, "the E-coli in the water is not the kind which can cause death," and both Ms. Gonzalez and the Defendant's son, David Singh, have been working together to improve the housing conditions. Indeed, the housing recently passed inspection.

Defendant did not have an appropriate certificate from the Department of Health while Plaintiffs resided in the housing. Defendant concedes this point, but argues this was a technical violation because he had a waiver from the certification requirement in 1997. It is true that Defendant's housing was not inspected by Ms. Gonzalez for or during the time period in which Plaintiffs lived in it. However, this was due only to Defendant's incorrect representation to Ms. Gonzalez that solely permanent workers resided in the housing at that time. Temporary worker housing is subject to inspection, but permanent worker housing is not.

The horrible condition of Defendant's housing continued virtually uninterrupted over many years. It is promising that Defendant's housing recently passed inspection. However, continuous violation of health and safety standards combined with the Defendant's obvious disregard for the condition of worker housing provides little reassurance that the housing will continue to be acceptable. An award of $500 per Plaintiff for the failure to comply with housing health and safety standards, and an award of $500 per Plaintiff for the failure to obtain appropriate certification, is merited.

The violation of the requirement to post the terms and conditions of occupancy of housing is less egregious. Plaintiffs make no specific argument with regard to an award based on this violation. Defendant argues this is a technical violation, and that all witnesses testified there were no conditions for living in the housing other than requesting permission from the Defendant and being employed by him. The Court recognizes that § 1821(c) requires posting of terms and conditions, *if any*, of occupancy of worker housing. This violation is a more technical one due to the absence of conditions for residing in the housing. An award of $100 per Plaintiff is sufficient.

 *Creation and Maintenance of Accurate Payroll Records (29 U.S.C. § 1821(d)(1)) and Provision of Payroll Statements to Workers each Pay Period (29 U.S.C. § 1821(d)(2)).* An agricultural employer must make and preserve for three years an accurate record of an employee's work and payment information. 29 U.S.C. § 1821(d)(1). An itemized writ-

ten statement of this information must be provided to each worker each pay period. 29 U.S.C. § 1821(d)(2). The payroll data submitted to the State of Washington and provided to Plaintiffs was erroneous because it listed the number of bins picked, not the hours worked. This improper record allowed the Defendant to hide minimum wage violations, and to report fewer hours worked in his orchard which allowed him to enjoy lower unemployment insurance premiums. This failure to maintain proper records occurred even though he utilized professional certified public accountant and bookkeeping services.

Defendant's blatant violation of payroll procedures merits an award of $500 per Plaintiff under § 1821(d)(1). The violation of § 1821(d)(2) is less worrisome because the Plaintiffs were paid the correct amount of wages agreed upon immediately before work commenced. Defendant did not attempt to defraud Plaintiffs. The paystubs were a natural outgrowth of the payroll itself. However, erroneous paystubs combined with erroneous reports to the State of Washington meant that Plaintiffs had no idea what benefits were accrued or taxes were due. An award of $300 per Plaintiff is appropriate for violation of § 1821(d)(2).

 *Posting of AWPA Rights (29 U.S.C. § 1821(b)).* The final violation found by the jury is of § 1821(b), a provision requiring an agricultural employer to conspicuously post at the place of employment a poster describing the various rights granted to migrant workers by the AWPA. Plaintiffs contend that no AWPA poster was ever provided at either the Chelan or Mattawa orchards, and this failure is another demonstration of the Defendant's complete disregard for the law and his attempt to keep workers from being advised of their legal rights. In response, Defendant argues that his son, David Singh, testified that he posted the AWPA poster at both the Chelan and Mattawa shops. The shops are a conspicuous place

because workers go there to get equipment. Also, some Plaintiffs testified they saw a poster, but did not know what it said. Plaintiffs simply did not exercise their rights to read the AWPA poster that was there.

Six Plaintiffs testified, and the parties stipulated that the other four would provide substantially similar testimony if they took the stand. All Plaintiffs testified that they did not enter the shop. One or two said they remember seeing a poster on the side of the shop, but did not read it. Perhaps these Plaintiffs were not typical in their patronage of the shop, but the fact that none of ten workers went in to the shop indicates it is not necessarily a conspicuous place. While no testimony explicitly stated this, Defendant's blatant disregard for the AWPA requirements raises concern about Defendant's motivation to keep workers unaware of their AWPA rights. This concern is compounded by the fact that Defendant Jarnail Singh's own testimony showed that he clearly was aware of the AWPA, and even believed many of its provisions applied to him. Nonetheless, David Singh's testimony that he posted an AWPA poster in the shop is uncontroverted. Since this is a posting, rather than a substantive, violation, an award of $300 per Plaintiff is appropriate.

In sum, each Plaintiff is awarded $3,400 in statutory damages, resulting in aggregate damages of $34,000 for violations of the AWPA.

### AWARD OF ATTORNEYS' FEES

The jury found that Defendant Jarnail Singh wrongfully terminated the Plaintiffs in violation of Washington public policy, and wrongfully discharged the Plaintiffs for engaging in concerted activity. They awarded Plaintiffs $8,500 each for their emotional distress and $2,730 each in lost wages.[1] Due to prevailing on these claims, Plaintiffs argue that they are entitled to

---

1. The parties have stipulated to an amended award of lost wages, reduced appropriately

for mitigation of damages, for each Plaintiff.

attorney's fees pursuant to R.C.W. 49.48.030. The parties agree on the applicable law, and that some attorneys' fees are due.

■ R.C.W. 49.48.030 provides as follows:

> In any action in which any person is successful in recovering judgment for wages or salary owed to him, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer: provided, however, that this section shall not apply if the amount of recovery is less than or equal to the amount admitted by the employer to be owing for said wages or salary.

WASH. REV. CODE § 49.48.030 (West 2000). It is established under this statute that attorney fees are recoverable in successful actions for lost wages due to wrongful discharge. *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wash.2d 426, 449–50, 815 P.2d 1362 (1991). While Washington State law regarding wrongful discharge permits recovery of attorney's fees, the AWPA does not. In cases where attorney fees are authorized for only some of the claims, "the attorney fees award must properly reflect a segregation of the time spent on issues for which attorney fees are authorized from time spent on other issues." *Hume v. American Disposal Company*, 124 Wash.2d 656, 672, 880 P.2d 988 (1994) (citations omitted). *See, also, Gaglidari*, 117 Wash.2d at 450, 815 P.2d 1362. Such segregation is required even when "claims are related and to some extent rest on a common core of facts ...." *Hume*, 124 Wash.2d at 673, 880 P.2d 988.

■ The appropriate method by which to calculate an award of attorney fees is the "lodestar method." *Bowers v. Transamerica Title Ins. Co.*, 100 Wash.2d 581, 596–97, 675 P.2d 193 (1983). Calculation of a lodestar figure begins with a determination of the number of hours reasonably expended in the litigation. *Id.* at 597, 675 P.2d 193. In furtherance of this determination, attorneys must provide "reasonable documentation of the work performed. This documentation need not be exhaustive or in minute detail, but must inform the court, in addition to the number of hours worked, of the type of work performed and the category of attorney who performed the work." *Id.* A court must discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time when determining the hours reasonably expended. *Id.* Then, the total number of hours reasonably expended are multiplied by a reasonable hourly rate of compensation. *Id.* The usual billing rate for a comparable attorney is a main factor, combined with the additional considerations of the (1) level of skill required by the litigation, (2) time limitations imposed on the litigation, (3) the amount of potential recovery, (4) the attorney's reputation, and (5) the undesirability of the case. *Id.*

■ After the lodestar figure is calculated, a court may consider adjusting the figure under one of two main categories: (1) the contingent nature of success and (2) the quality of work performed. *Bowers*, 100 Wash.2d at 598, 675 P.2d 193. An adjustment due to a contingency fee arrangement considers the risk assumed by counsel. A court must assess the likelihood of success at the outset of the litigation; thus, the risk factor adjustment should apply "only where there is no fee or agreement that assures the attorney of fees regardless of the outcome of the case." *Id.* at 598–99, 675 P.2d 193. If the hourly rate underlying the lodestar fee includes an allowance for the contingent nature of the fees, no further adjustment should be made. *Id.* at 599, 675 P.2d 193. The second basis on which the lodestar may be adjusted, the quality of work performed, is an extremely limited basis appropriately invoked only when representation is unusually good or bad. *Id.* The party seeking any deviation from the lodestar figure must carry the burden of justifying the deviation. *Id.* at 598, 675 P.2d 193.

The Court accepts Plaintiffs' attorneys' requested hours and hourly compensation as the lodestar figure. Mr. Morrison and Mr. Williamson worked a total of 505.3 hours that they wish to have considered. This number reflects 331.3 hours worked by Mr. Morrison, and 174 hours worked by Mr. Williamson. Mr. Morrison's hourly rate is $150, and Mr. Williamson's hourly rate is $300. Counsel suggest that dividing their total hours spent on this matter in half results in an appropriate segregation of time spent on the wrongful discharge claim.

The Court recognizes that there was a significant amount of overlap between the discovery and preparation for the AWPA and the wrongful discharge claims. However, more briefing and time during trial was spent on the AWPA claims. For example, two witnesses (Natalie Gonzalez and Carl Brenner) testified only regarding AWPA housing violations, and their testimony took half of one day during a total of four days of testimony and argument. Based on observation of the briefing and trial in this matter, allocation of 65% of time to the AWPA claims and 35% of time on the wrongful discharge claim is appropriate. Thirty-five percent of Mr. Morrison's requested hours is 115.95, resulting in a recovery of $17,392.50. Thirty-five percent of Mr. Williamson's requested hours is 60.9, resulting in a recovery of $18,270.00. The total award of attorney fees is $35,662.50.

Defendant argues that a downward adjustment to the lodestar figure is appropriate due to the lack of a risk factor in this case for two reasons. First, a wrongful discharge claim is not a novel issue. The existence of *Bravo v. Dolsen Companies*, 125 Wash.2d 745, 888 P.2d 147 (1995) diminished the risk because case law favorable to Plaintiffs existed. Second, Columbia Legal Services (Mr. Morrison's employer) has tried many cases based on similar facts. Mr. Morrison receives a salary regardless of the outcome of a case, and his affiliation with Columbia Legal Services brought experience to this case. These arguments are not convincing. Favorable case law and experienced counsel are beneficial to a party. However, the risk contemplated by an adjustment under *Bowers* addresses the possibility of compensation rather than success on the merits. No adjustment is required.

Plaintiffs' counsel additionally request recovery for half of their time expended after January 12, 2000, as a sanction for Defendant's allegedly improper requested continuance. As discussed in the upcoming section addressing sanctions, many of these attorney hours would be expended regardless of the date of trial. Block awards of attorney hours to sanction Defendant would be excessive. No attorney fees are awarded specifically as a sanction.

## SANCTIONS FOR DELAY OF TRIAL CAUSED BY JARNAIL SINGH'S ALLEGED MEDICAL CONDITION

This matter originally was scheduled for trial on January 24, 2000. On January 10, 2000, defense counsel was alerted to Defendant Jarnail Singh's alleged health problems, and contacted Plaintiffs' counsel. On January 12, 2000, Defendant Jarnail Singh moved to continue the trial due to a recent diagnosis of an anterior wall myocardial infarction (i.e., a heart attack) which rendered it impossible for him to return from India. At that time, Defendant submitted a brief summary from Dayanand Medical College & Hospital in India stating he was not allowed to travel for 6–8 weeks. The parties agreed to continue trial until April 17, 2000. However, Plaintiffs and the Court requested additional documentation of Defendant's medical condition. Plaintiffs were suspicious of the reason for the requested continuance because Defendant had not submitted certain trial materials in a timely fashion. Also, Jarnail Singh regularly spends the winter months in India. Defense counsel agreed to provide additional medical documentation as it became available. No such documentation was submitted during the following two months.

On March 21, 2000, defense counsel sent a fax of a new, five-sentence diagnosis from Mr. Singh's treating physician to the Court and to Plaintiffs' counsel. It was a brief letter stating Jarnail Singh was treated and released from the hospital after a diagnosis of an uncomplicated case of myocardial infarction. It also listed four medications prescribed for Mr. Singh, and stated that travel was not advised for 6–8 weeks. On March 27, 2000, a telephonic hearing was held on Plaintiffs' request that the Defendant immediately produce all medical records relevant to Jarnail Singh's medical condition. The Court ordered that, on or before the trial date, the Defendant produce Jarnail Singh's complete medical records in relation to his January, 2000 myocardial infarction. Defendant timely produced three pages of records. The first is the original of March 21, 2000 fax. The second and third documents are faxes of a basic discharge card and a handwritten discharge summary. None of these documents contain details, a date, or a legible signature.

Plaintiffs ask for sanctions of the total increased costs of litigation of $1,467.50, a sum which includes $1,432.50 for rescheduling airline tickets and $35.00 to reserve a subpoena on a witness. Plaintiffs' counsel also request one-half of the hours spent preparing for trial between January 12, 2000, the date the Defendant moved for a continuance, and the trial date. Plaintiffs argue these sums are due because the Defendant misrepresented his health condition to delay the proceedings, and because he failed to comply with the Court's Order to produce his full medical records to substantiate his claim. In response, Defendant argues he suffered a mild heart attack in a foreign country which has a different system than the United States, and he has not been able to obtain any more medical records. Also, Plaintiffs' counsel was informed of Defendant's medical condition on January 10, 2000, and the airline tickets for Plaintiffs were not purchased until that date. Finally, counsel do not need to re-prepare for trial once they are ready, and thus attorney's fees are not due.

 Plaintiffs urge this Court to award sanctions under its inherent power to regulate a case both for bad faith conduct and for failure to comply with a Court order. The scope of a federal court's inherent power to sanction a litigant for bad faith conduct was explored in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (holding a district court properly invoked its inherent power in assessing as a sanction attorney's fees and related expenses for a party's bad faith conduct). The inherent authority to sanction a party's conduct is not a broad power, but rather a narrow, implied power that must be exercised with restraint and discretion. *Id.* at 42, 44, 111 S.Ct. 2123. Nonetheless, it is firmly established that a court's implied authority to sanction a party's conduct exists. *Id.* at 44, 111 S.Ct. 2123. There are several defined circumstances in which a court can use its power to assess fees and costs despite the "American rule" generally prohibiting fee-shifting. Relevant to the instant case are two of these exceptions. First, "a court may assess attorney's fees as a sanction for the willful disobedience of a court order." *Id.* at 45, 111 S.Ct. 2123, *quoting Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The power to punish for contempt reaches both conduct before the Court and conduct beyond the Court's confines because the underlying concern giving rise to the power generally was disobedience to orders of the judiciary. *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123, *quoting Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). Second, "a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45–46, 111 S.Ct. 2123, *quoting Alyeska*, 421 U.S. at 258–59, 95 S.Ct. 1612. When imposing a sanction on this basis, a court must make a finding

of bad faith. *Chambers,* 501 U.S. at 46, 49, 111 S.Ct. 2123. Such a finding may relate to delay or disruption of litigation, hampering enforcement of a court order, or a fraud practiced upon the court. *Id.* at 46, 111 S.Ct. 2123.

■ Certain statutes and Federal Rules of Civil Procedure address sanctionable conduct. If conduct can be sanctioned adequately under existing rules, a court ordinarily should rely on the rules rather than on inherent power to impose sanctions. *Chambers,* 501 U.S. at 50, 111 S.Ct. 2123. However, "if in the informed discretion of the court, neither the statute nor the rules are up to the task, the court may safely rely on its inherent power." *Id.* A court may even rely on its inherent power if procedural rules exist which sanction the same conduct. *Id.* at 49, 111 S.Ct. 2123. This situation arises if a long or interwoven course of conduct is being sanctioned, part of which may be sanctioned under the rules and part of which may not.

In the instant case, the parties agree that *Chambers* sets out the applicable law. No party cites any rules or statutes that control a potential award of sanctions. Notably, the two common provisions under which sanctions are awarded do not appear to apply to the delay caused by Defendant's allegedly falsely represented medical condition. Fed.R.Civ.P. 11 provides for sanctions against any attorney who submits a pleading, written motion, or other paper to the court in which the attorney certifies to the best of his knowledge that the paper is not being presented for any improper purpose, its contents are warranted and non-frivolous, and allegations have evidentiary support. FED. R. CIV. P. 11(b) and (c). This rule is inapplicable in the instant case because it applies to attorneys or pro se parties so certifying a document. Plaintiffs do not request sanctions against Defendant's counsel, but rather against the Defendant. The Defendant is represented by counsel who certified the information provided by the Defendant was true and correct to the best of the counsel's knowledge, placing the Defendant himself outside of the reach of Rule 11. Rule 11 places an affirmative obligation on an attorney to know what he is signing. However, given the suddenness of a heart attack combined with the distance of this particular client, some lack of knowledge seems excusable.

Also, 28 U.S.C. § 1927 provides for sanctions against "an attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously ...." Again, Plaintiffs do not accuse defense counsel of improper conduct. Instead, they assert that "the Defendant abused the judicial process and acted in bad faith when he authorized his attorney to obtain a trial continuance on the grounds he suffered a heart attack." Also, delay, rather than multiplication, of proceedings is Plaintiffs' concern.

This Court first ordered the Defendant to produce "an update regarding Defendant Jarnail Singh's medical prognosis, including a detailed report from Mr. Singh's treating physician" on January 11, 2000. Ct. Rec. 71. Defense counsel submitted a letter on January 27, 2000 that briefly updated Mr. Singh's condition, but stated that he was "somewhat hindered in receiving this update on a timely basis" due to a national holiday in India and time zone differences. No update was received until March 21, 2000. The update consisted of a one-page, undated, five sentence summary of Mr. Singh's medical condition that added no new details.

On March 27, 2000, the Court ordered that on or before the April 17, 2000 trial date, the Defendant produce Jarnail Singh's complete medical records. Ct. Rec. 75. Three documents were submitted, but not filed as required by the Court's Order, on the day of trial. One document is the original of the fax submitted on March 21, 2000. The other two documents are an undated, unsigned discharge card and discharge summary.

They were faxed from Cyber Cafe USA, not a medical facility, and contain few additional details. The Defendant is in contempt of the Court's two Orders to update and produce complete medical records. It is very unlikely that these three pages constitute Mr. Singh's entire medical file in relation to his January, 2000 heart attack.

 Mr. Singh's alleged heart attack occurred shortly before January 10, 2000. After two Court Orders, and the passage of six months, no additional details or more substantial medical records have been provided. As Plaintiffs point out, the timing of the alleged heart attack is suspect. Plaintiffs previously alleged, and Mr. Singh stated during testimony at trial, that he habitually spends the winter and early spring months in India. Coming to the United States for a trial commencing on January 24 would disrupt his usual plans. The request for a continuance based on Mr. Singh's heart attack occurred immediately after the passage of the deadline for filing trial materials, and the Defendant did not submit several important documents, including proposed jury instructions. Several other factors also are noteworthy. During the March 27, 2000 telephonic hearing, defense counsel stated his client was in Canada. Mr. Singh clearly was able to travel from India to Canada more than three weeks in advance of the new trial date. Furthermore, certain absent evidence creates concern. Mr. Singh, who spends substantial time in India, has not been able to obtain additional medical records in six months. Defendant argues that the system is different in India. This may be true. Nonetheless, logic dictates that more than a discharge card and summary should exist. Mr. Singh has not offered testimony or an affidavit regarding his condition, nor has he submitted any documentation by a doctor in the United States. The lack of evidence of Mr. Singh's medical condition supports finding that Defendant's representation of his illness was an action in bad faith that delayed and disrupted this litigation.

Sanctions may be imposed in light of Defendant's contempt and bad faith action. Plaintiffs request $1,432.50 for rescheduling previously purchased airline tickets, $35.00 to reserve a subpoena, and one-half of the attorney hours spent preparing for trial between January 12, 2000, and the trial date. Mr. Morrison's Affidavit regarding attorney's fees states that, on January 10, 2000, he made travel plans for clients and witnesses. No entry regarding travel reservations was made prior to that date. The parties agree that defense counsel contacted Plaintiffs' counsel on January 10, 2000 to warn them of a potential delay. Defendant essentially argues that Plaintiffs could have mitigated damages by not making travel arrangements on January 10, 2000, because counsel was informed of the potential delay on that date. However, the entry regarding travel plans occurs prior to an entry on the same day regarding a telephone call with defense counsel. Also, January 10 is 14 days prior to January 24, the scheduled trial date. It is common knowledge that airline tickets are far less expensive if purchased 14 days in advance.

Since the request for a continuance was not granted by January 10, it is logical that Plaintiffs would make their airline arrangements. However, the entire $1,432.50 for Plaintiffs' airline tickets is not an appropriate award. This amount includes $351.50 for one Plaintiff whose ticket was first purchased on March 29. Apparently, he was not available on the previous date. Availability of a Plaintiff, and requisite costs incurred by his availability, is not deleterious. The remainder of the requested travel expenses are recoverable. The travel summaries submitted to the Court list eight airline-imposed change fees at $35 per ticket, totaling $280; increased costs of airline tickets totaling $771; and three additional transaction fees totaling $30. The total travel-related cost of delay is $1,081.

Recovery of the various change fees and costs is merited. The $35 to reserve the

subpoena on witness Keith Carlisle also is appropriate. However, half of the attorney hours between January 12, 2000 and April 17, 2000 is not. The heavy hours of preparation required the week before trial occur regardless of when trial is scheduled. A review of Plaintiffs' counsels' timesheets submitted in support of the award of attorney's fees shows little time was spent opposing the requested continuance and requesting Defendant's medical records. A portion of this time already is recovered by counsel through the award of attorney fees. Further sanctions are not merited. Therefore, sanctions in a total amount of $1,116.00 representing increased costs of litigation are awarded against the Defendant.

## AWARD OF PRE–JUDGMENT INTEREST

█ Plaintiffs request an award of pre-judgment interest on the amount of lost wages recovered by Plaintiffs on their wrongful discharge claim. After mitigation, Plaintiffs recovered a total of $16,353.62 in lost wages. Plaintiffs request pre-judgment interest from November 1, 1997, through the entry of the judgment because the wages should have been paid to Plaintiffs during September and October, 1997.

"Washington law has historically treated pre-judgment interest as a matter of right when a claim is liquidated. A liquidated claim is one where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *Dautel v. Heritage Home Center, Inc.*, 89 Wash.App. 148, 153, 948 P.2d 397 (1997), *review denied*, 135 Wash.2d 1003, 959 P.2d 126 (1998) (internal quotations omitted). Ms. Dautel recovered back wages and commissions. The court found that Ms. Dautel was entitled to an award of pre-judgment interest because the trial court did not exercise any discretion in determining the amount. The calculation of back wages was based on the objective data of the minimum wage rate, the number of hours worked, and Ms. Dautel's

gross pay. Interest also was appropriately awarded on the commissions owed because, once it was determined on what transactions Ms. Dautel had earned a commission, her commission was a set rate of twenty percent. These liquidated amounts allowed the court to award pre-judgment interest.

In the instant case, Plaintiffs were awarded lost wages in an original amount of $2,730 each. Reaching this sum required the jury to project the anticipated length of the apple harvest, and the number of bins each Plaintiff would pick per day, based on testimony. The amount of lost wages was not a mathematical formula calculated by application of objective data. Indeed, the stipulated mitigation later agreed to by the parties shows each Plaintiff earned a different amount of wages during the mitigation period, yet all Plaintiffs mitigated damages by picking apples. Plaintiffs' claim for lost wages was not a liquidated one. Therefore, pre-judgment interest on the lost wages recovered is not merited.

Accordingly,

**IT IS ORDERED** that:

1. Judgment shall be **ENTERED** in the following amounts:

(a) **EMOTIONAL DISTRESS DAMAGES in the amount of $8,500 each** to Plaintiffs Santiago Herrera, Armando Andres, Luciano Andres, Jesus Andres Torres, Bertoldo Garcia, Roberto Gonzalez, Jose de Jesus Ortiz, Pedro Ybarra, and Joseph Romero, **nunc pro tunc to April 21, 2000;**

(b) **LOST WAGES, nunc pro tunc to April 21, 2000,** in the following amounts:
1) Armando Andres—$1,518.95;
2) Luciano Andres—$1,404.00;
3) Jesus Andres Torres—$1,503.00;
4) Bertoldo Garcia—$1,500.45;
5) Roberto Gonzalez—$1,386.00;
6) Santiago Herrera—$2,050.00;
7) Jose Nicolas—$1,816.30;
8) Jose de Jesus Ortiz—$1,313.45;

9) Joseph Romero—$1,911.47; and

10) Pedro Ybarra—$1,950.87;

(c) **STATUTORY DAMAGES in the amount of $3,400 to each** Plaintiff, totaling $34,000 for all AWPA violations;

(d) Sanctions in the amount of $1,116.00 against Defendant Jarnail Singh;

(e) Attorney's fees in the amount of **$17,392.50 to Joachim Morrison;**

(f) Attorney's fees in the amount of **$18,270.00 to Roblin Williamson;**

(g) **Interpreter Levi Enriquez's costs of $660.00** pursuant to Fed.R.Civ.P. 43(f); and

(h) Post–Judgment interest.

2. The District Court Executive is directed to:

(a) File this Order;

(b) Provide copies to counsel; and to

(c) **CLOSE** this file.